

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NADINE PELLEGRINO AND          :
HARRY WALDMAN,                 :
                               :
            Plaintiffs,        :        CIVIL ACTION
                               :
     v.                        :        NO. 09-5505
                               :
UNITED STATES OF AMERICA       :
TRANSPORTATION SECURITY        :
ADMINISTRATION, et. al.,       :
                               :
            Defendants.        :


### MEMORANDUM AND ORDER

Joyner, C.J.                              February 27, 2012

     Before this Court are Defendants' Motion to Dismiss the
Third Amended Complaint (Doc. No. 40), Plaintiff's Response in
opposition thereto (Doc. No. 63), Defendants' Reply (Doc. No. 66)
and Plaintiff's Sur-Reply (Doc. No. 76). For the reasons set
forth in this Memorandum, the Motion to Dismiss is granted in
part and denied in part.

### FACTUAL BACKGROUND

     This case centers on what should have been a swift and
routine airport security screening. Instead, the interactions
between the parties escalated into a criminal prosecution that
took nearly two years to resolve in the Philadelphia Municipal
Court and this subsequent civil action that has been litigated in
our Court for even longer. The Third Amended Complaint

(hereinafter "Complaint") provides an incredibly detailed account of the events underlying this action, which we accept as true for the purposes of resolving the instant Motion. See Vallies v. Sky Bank, 432 F.3d 493, 493 (3d Cir. 2006).

On July 29, 2006, Plaintiff Nadine Pellegrino ("Pellegrino") and her husband, Plaintiff Harry Waldman ("Waldman") embarked on a trip to their home in Florida. Both are business consultants, among other professional roles, and frequently travel by air. At around 7 pm, Plaintiffs arrived at the security checkpoint at the Philadelphia International Airport. After passing through the metal detector, Pellegrino was detained in a public detention pen while a male Transportation Security Administration ("TSA") Transporation Security Officer ("TSO") began to conduct a more in-depth screening of her bags. Concerned about how the TSO was rough-handling her luggage and his disrespectful attitude, Pellegrino requested a private search. She claims that, in her mind, a private search "did not mean a behind-closed-doors search; it meant a female to search her bags." Compl. at 7.

Several minutes later, Defendant TSA TSO Nuyriah Abdul-Malik ("Abdul-Malik") arrived at the checkpoint to complete the screening process; she was already wearing gloves when she approached Pellegrino's bags. Believing that TSA screening procedures require TSOs to change their gloves upon request by an individual, Pellegrino immediately requested Abdul-Malik change

2

her gloves before touching Pellegrino's belongings. Abdul-Malik complied, but in the process physically contaminated the new set. Pellegrino describes this request as the catalyst for Abdul-Malik's "visibly inappropriate, observably unwarranted venomous nonverbal animosity" toward her. Id. at 8.

Abdul-Malik transported Pellegrino's bags into a private screening room near the checkpoint.[1] After TSO Abdul-Malik disappeared from sight with Pellegrino's belongings, Pellegrino remained standing in the pen for several minutes, without any information from the TSO about what was happening next. Eventually, Pellegrino was directed to accompany Abdul-Malik in the screening room. Defendants TSO Denice Kissinger ("Kissinger") and TSA Supervisor TSO Laura Labbee ("Labbee") arrived to assist in the private screening, closing the door behind them.

The TSOs began a personal screening of Pellegrino's body. Pellegrino was directed to hold her arms out at a 90 degree angle and stand with her legs apart. Kissinger swabbed both the front and back of Pellegrino's shirt and skirt with a wand, then left the closet to obtain Explosive Test Detection (ETD) results.

TSO Abdul-Malik examined the contents of Pellegrino's belongings. She counted all of the currency and coins; examined the front and back of each of Pellegrino's library, insurance,

---

[1] The private screening room is a thin-walled partitioned cubicle with a door, which Plaintiffs refer to as "the closet" throughout their Complaint.

3

credit and membership cards; looked at Pellegrino's cell phone data; read her personal notes; "rifl[ed] through" her business papers; and opened and smelled her cosmetics, hand sanitizer, mints, pen and lipstick. Id. at 13. Abdul-Malik left open the lids to the mints and hand sanitizer containers, resulting in their contents being dispersed throughout her handbag, rendered unusable, and further damaging her property. Pellegrino also alleges that Abdul-Malik permanently damaged her personal property while "punching, ramming, jamming and forcing examined items back into the tote in disrespectful ways." Id. In particular, when Abdul-Malik attempted to close Pellegrino's rolling tote bag, Abdul-Malik used her knee and body weight to compress the bags contents while forcibly yanking on the zipper pull and damaged the bag itself. Abdul-Malik then placed the damaged rolling tote bag under the search table and pushed it to the far back corner. Labbee watched this damage take place but did not intervene.

While the screening took place, Pellegrino informed the TSOs that she intended to report their mistreatment to TSA superiors. Abdul-Malik twice threatened Pellegrino with arrest for speaking out about abusive conduct by the agents. Speaking directly to Labbee and in front of Pellegrino, Abdul-Malik insisted that they call the Philadelphia police.

4

Though Pellegrino voiced her intent to report the TSOs, she did not say or do anything to interfere with or attempt to stop the screening. Nothing prohibited was found in Pellegrino's luggage, and Labbee told Pellegrino that she was free to pack her things and proceed from the screening area. Pellegrino decided to repack her belongings in public and proceeded to remove her items one by one to a search table outside the private screening room. In the process, she tossed some of these items in that direction after first making sure no one was in the immediate vicinity.

Labbee and Abdul-Malik remained in the private screening room throughout this process. During this time, one or both of the TSOs disposed of three of Pellegrino's items into a trashcan inside the private screening room without her knowledge or permission. When Pellegrino attempted to remove the final item—her rolling tote bag—Abdul-Malik physically blocked Pellegrino's access. Pellegrino was forced to get down on her arthritic hands and knees and crawl under the table to grab hold of the bag's handle. After several attempts, Pellegrino successfully grabbed the bag and wheeled it out of the private screening room. At no time did the rolling tote bag, or any of Pellegrino's possessions, come into physical contact with Abdul-Malik, Labbee or any other person.

While Pellegrino repacked her belongings at the checkpoint search table, TSO Labbee exited the screening room, approached

her, and informed her that she was being re-detained.[2] Labbee did not provide a reason for the re-detention, and also denied any knowledge of the whereabouts of Pellegrino's missing property. Labbee directed Pellegrino that she could not touch her belongings or move from her current position at the search table. Labbee also confiscated Pellegrino's driver's license.[3]

About twenty minutes passed from Plaintiffs' arrival at the checkpoint until Pellegrino's re-detention following the private screening. Then, from 7:20-7:35pm, TSA Federal Security Manager Richard Rowe, TSA Aviation Security Inspector Osbourne Shepherd, US Airways representative Sari Salameh and Philadelphia Police Department Officers were all summoned to and arrived at the checkpoint area. After their arrival at the checkpoint, several unidentified TSOs and police officers stood around, conversing with one another and with TSOs Abdul-Malik, Labbee, and Kissinger. During this time, Waldman was instructed to leave the immediate area of the investigation and Pellegrino remained at the checkpoint search table. Neither was given any information about what was happening.

---

[2] Pellegrino immediately requested that the TSA official in charge at the Philadelphia International Airport be called to the checkpoint. While Robert Ellis, the TSA Federal Security Director and official in charge at the time, was notified as a matter of procedure, neither he nor his representative arrived at the checkpoint to speak with Plaintiffs.
[3] Pellegrino informed her husband that she was being re-detained. Waldman in turn sought information from TSO Labbee. Instead of informing Waldman of the accusations against his wife, Labbee asked Waldman for private medical health information about Pellegrino, including what medications she was taking, particularly about drugs related to mental health.

Plaintiffs later found out that TSOs Labbee and Malik had accused Pellegrino of assault. Pellegrino alleges the two agents devised a plan together to make these false allegations during the time that Pellegrino walked in and out of the private screening room, removing her luggage. Abdul-Malik lied to the police about the events that took place during the private screening and accused Pellegrino of striking the agent's left calf and ankle with a suitcase. Labbee then also falsely accused Pellegrino of assault, claiming Pellegrino struck her in the stomach with the end of a large suitcase and caused her to fall into the screening room door. Although TSO Kissinger was not in the screening room at the time of the alleged assaults, Kissinger voluntarily lied, told the police that she witnessed the incident, and confirmed the other agents' accounts.

Abdul-Malik and Labbee insisted on pressing charges against Pellegrino. As a result, a Philadelphia police officer frisked Pellegrino in the private screening area at the checkpoint. The officer then arrested Pellegrino, placed her wrists in handcuffs behind her back and transported her out of the airport, with fellow officers escorting, in a humiliating "public spectacle." Id. at 21. TSA officials had detained Pellegrino for about an hour before the arrest took place.

After her arrest, Pellegrino maintains that she was held "in horrific conditions for up to roughly 18 hours." Id. at 23.

7

During this time, Airport Division Officer Michael Browne drove Defendants TSOs Labbee, Abdul-Malik and Kissinger to the Philadelphia Police Department Southwest Division Station, where Detective William Campbell interviewed them. Labbee and Abdul-Malik filed criminal complaints against Pellegrino. Eventually, Waldman posted bail for his wife, though Plaintiffs do not indicate the amount or at what time it was paid. The District Attorney's Office pursued felony charges for aggravated assault and several misdemeanor charges: two counts reckless endangerment of a person; two counts simple assault; two counts possession of instruments of crime (the suitcases used to strike the TSOs); and, two counts making terroristic threats. Id. at 24, n.72.

On August 14, 2006, Pellegrino received a letter from the TSA indicating that the agency had initiated a Civil Action Enforcement investigation into the July 29th incident and was considering imposing a civil penalty for her actions. From August 14-25, 2006 several fruitless attempts—both in writing and over the phone—were made by Plaintiffs' attorney to contact the TSA to defer the civil action enforcement investigation and to seek preservation of the checkpoint surveillance video recordings for future subpoena.[4]

---

[4] In April 2007, the TSA informed Pellegrino as well as the District Attorney's Office that no video cameras captured the incident and no recording existed for evidentiary purposes. Based on their own observations as well as documentation that security cameras were installed throughout the airport, Plaintiffs vehemently believe that overhead video surveillance recordings captured the incident, but were destroyed or lost by the TSA.

On October 25, 2006, Plaintiffs traveled back to Philadelphia for a preliminary hearing in the criminal case against Pellegrino. All charges against Pellegrino were dismissed by the judge at this time or abandoned by the District Attorney's Office shortly thereafter with the exception of two counts of simple assault and two counts of instrumentality of a crime. The criminal trial against Pellegrino on these remaining charges took place on March 28, 2008 in the Philadelphia Municipal Court.

Since the TSA failed to produce video surveillance recordings from the checkpoint area on the night of the incident, despite a subpoena, the presiding judge ruled that no witnesses could testify to matters that occurred outside the private screening room as the best evidence of those events had not been preserved. Labbee testified that Pellegrino hit her with a bag, but the judge barred her testimony because Labbee also testified that she was partially outside the door to the private screening room at the time. Abdul-Malik did not appear at the trial and did not testify. The judge entered not guilty verdicts as to the remaining charges against Pellegrino.

On July 28, 2008, Plaintiffs submitted a joint claim to the TSA outlining the alleged abuses by the agents, which the TSA in turn denied on May 19, 2009. Plaintiffs then initiated the present action before this Court on November 18, 2009. We have given Plaintiffs several opportunities to amend their pleadings,

as well as multiple extensions of time; similarly, we have allowed Defendants extensions of the pleading deadlines. On February 17, 2011, Defendants filed a Motion to Dismiss, seeking to dismiss all claims pursuant to Fed. R. Civ. P. 8 and 12(b)(6). We decline to dismiss the case under Rule 8 for the failure to file a simplified pleading, though we acknowledge the length and redundancy of Plaintiffs' pleading.

### STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), the district court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn there from." Krantz v. Prudential Invs. Fund Mgmt., 305 F.3d 140, 142 (3d Cir. 2002) (quoting Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plaintiff need not satisfy any "probability" requirement, but must set forth "more than a sheer possibility that a defendant has acted unwillingly." Id.

10

"[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007). "When presented with a *pro se* litigant, [the Court has] a special obligation to construe his complaint liberally." <u>Higgs v. AG of the United States</u>, 655 F.3d 333, 339 (3d Cir. 2011)(citations omitted). "Thus, even if a *pro se* plaintiff's claims are not set out in the clearest fashion, the Court is obligated to discern all the possible claims that the Plaintiff may be alleging." <u>Thomas-Warner v. City of Phila.</u>, 2011 U.S. Dist. LEXIS 146029, at *10 (E.D. Pa. Dec. 20, 2011). However, in doing so the Court still determines whether *pro se* plaintiffs have alleged sufficient facts to support the claims divined from the pleadings. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Iqbal</u>, 129 S.Ct. at 1949. Moreover, "[a]lthough the Court must accept well-pleaded facts as true, it need not credit bald assertions or legal conclusions." <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1429 (3d Cir. 1997).[5]

---

[5] Both parties attach documents to their pleadings. "In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint and any matters incorporated by reference or integral to the claim." <u>Buck v. Hampton Twp. Sch. Dist.</u>, 452 F.3d 256, 260 (3d Cir. 2006).

11

## DISCUSSION[6]

Nadine Pellegrino filed her complaint jointly with her husband, Harry Waldman. As a preliminary matter, however, his claims are dismissed for lack of standing, with the exception of the claims pursuant to the Freedom of Information Act (FOIA), discussed *infra*.[7]

I.   **Claims for Tort Damages Pursuant to the Federal Torts Claim Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680[8]**

The Federal Tort Claims Act (FTCA) confers jurisdiction upon the district courts over claims for damages "for injury or loss of property, or personal injury or death" caused by the negligent or wrongful acts or omissions of federal employees. The liability of the United States is determined in accordance with state law, in the same manner and to the same extent as a private individual in like circumstances. 28 U.S.C. §§ 1346(b), 2674. Plaintiffs may bring claims in federal court based on the action of Government employees, but only "when private persons engaging in analogous behavior would be liable under state law." <u>CAN v. United States</u>,

---

[6] In an effort to clarify the alleged claims, we re-number and re-organize the issues in our current analysis, discussing each potential legal basis for the civil action <u>seriatim</u>.

[7] While Waldman may have standing to bring a claim of negligent infliction of emotional distress as a result of witnessing the alleged tortious treatment of his wife, this claim fails outright, as discussed *infra*, because Waldman did not suffer physical harm.

[8] Only the United States is a proper defendant under the FTCA. Therefore, we dismiss all FTCA claims against the individual defendants, as well as the TSA, substituting the United States. <u>See</u> 28 U.S.C. § 2679(d)(1).

535 F.3d 132, 138 (3d Cir. 2008).[9] In this case, Pennsylvania law determines the extent of the United States' liability under the FTCA. See Molzof v. United States, 502 U.S. 301, 305 (1992).

Defendants recognize Plaintiffs' attempt to plead FTCA claims and protest that these claims are time barred. Based on the information before us, we disagree. To sustain a tort claim against the United States, an individual must first present the claim in writing to the appropriate federal agency, including a request for a specific compensation sum, within two years of accrual. 28 U.S.C. §§ 2401(b), 2675(a). Then, if the agency denies the claim, a civil action must be initiated within six months of the date of mailing of notice of final denial of the claim. Id. Failing to follow this procedure deprives federal courts of subject matter jurisdiction. White-Squire v. U.S. Postal Serv., 592 F.3d 453, 456-58 (3d Cir. 2010).

Plaintiffs presented their joint complaint to the TSA on July 28, 2008—within two years of the July 29, 2006 incident at the Philadelphia airport. TSA denied the claim on May 19, 2009 and Plaintiffs initiated the current action within the six month

---

[9] For this reason, Plaintiffs do not have a viable cause of action under the FTCA for the failure of the TSA officers to follow internal TSA policies, regulations, and standard operating procedures. Moreover, despite many citations to TSA policies, Plaintiffs have not provided an alternative, plausible legal basis for such a claim.

time span on November 18, 2009. Thus, it appears Plaintiffs followed the required procedure in a timely manner.[10]

We recognize that we cannot yet ascertain the specifics of the claim presented to the TSA. Plaintiffs describe an all-encompassing document. If it is established that Plaintiffs did not adequately present the basis for investigation into any of the following grounds for FTCA liability, or failed to allege a specific sum of damages, then this Court will lack jurisdiction. For the time being, however, we look to see whether Plaintiffs plead the elements of a tort that is actionable under the FTCA.

## A. **Property Damage**

Pellegrino has plead a claim against TSA Officers for causing permanent damage to her property during the airport security search and then afterward disposing of her property without permission. She identifies several damaged items: eyeglasses, expensive gold jewelry, an irreplaceable coin purse from Pellegrino's late father, and her various bags.

---

[10] In lieu of continuing to challenge the timeliness of Plaintiffs' FTCA claims, Defendants then argue that Plaintiffs have consistently framed their claims as constitutional violations rather than as torts, and that we must do likewise and dismiss. However, the Complaint asserts in relevant part: "Under the Federal Torts Claims Act, defendants USA and TSA are liable for the above described damages caused by the actions of its screeners, Abdul-Malik and Labbee." Compl. at 16. In addition, Plaintiffs mention that the United States is an appropriate defendant under the FTCA in their statement of jurisdiction. Id. at 2. We find that these statements are more than enough to meet the present standard. Moreover, Plaintiffs may simultaneously pursue *Bivens* claims to remedy constitutional violations committed by federal employees and FTCA claims to remedy torts arising from the same action. See Carlson v. Green, 446 U.S. 14, 20 (1980); Hoffenberg v. United States, 430 Fed. Appx. 91, 92 (3d Cir. 2011).

## B. False Arrest, False Imprisonment, and Malicious Prosecution

Through the FTCA, the United States chose to abrogate its sovereign immunity and provide an avenue for tort claims for the wrongful conduct of federal employees. However, the abrogation of immunity is not absolute. Plaintiffs cannot bring "any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. §2680(h). There is only one exception to this bar on intentional tort claims: charges of assault, battery, false imprisonment, false arrest, abuse of process and malicious prosecution claims may be brought against "investigative or law enforcement officers of the United States Government." _Id_.

### 1. Whether TSOs fall within the §2680(h) "Investigative or Law Enforcement Officer" Exception

"Investigative or law enforcement officer" is defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. §2680(h). There is little guidance in case law as to whether this definition encompasses Transportation Security Administration Officers (TSOs) involved in conducting and supervising airport security screenings.

Asserting that TSA officers do not fall within the "investigative or law enforcement officer" exception, Defendants cite a single, unpublished case that is not binding on this

15

Court: <u>Coulter v. U.S. Dep't of Homeland Sec.</u>, 2008 U.S. Dist.
LEXIS 73014 (D.N.J. Sept. 23, 2008). In <u>Coulter</u>, the plaintiff
claimed that a TSA employee conducted an individual inspection at
the Newark Airport security checkpoint in a physically invasive,
abusive, and harassing manner; among her allegations, plaintiff
asserted that the TSA employee groped her breasts, placed a hand
inside her skirt and held it against her stomach, and shoved a
hand-wand into her groin. <u>Id</u>. at *2. However, the court denied
plaintiff's assault claim against the TSA employee for this
tortious conduct because "airport security screeners do not
constitute investigative or law enforcement officials within the
meaning of the FTCA." <u>Id</u>. at *21.

Like the court in <u>Coulter</u>, Defendants argue that TSOs merely
conduct "screenings" rather than searches within the meaning of
§2680(h).[11] However, this appears to clash with Third Circuit
precedent. Routine airport pre-boarding security screenings are

---

[11]   Though the District Court for the District of New Jersey reached this
conclusion largely by relying on <u>Welch v. Huntleigh U.S.A. Corp.</u>, 2005 WL
1864296 (D. Or. Aug. 4, 2005), the court briefly cited to <u>Matsko v. United
States</u>, 372 F.3d 556 (3d Cir. 2004). In <u>Matsko</u>, the Third Circuit held that a
federal employee of the Mine Safety and Health Administration "should not be
treated as an 'investigative or law enforcement officer' for purposes of
determining whether sovereign immunity attaches." <u>Id</u>. at 560. The Third
Circuit declined to resolve whether the §2680(h) exception applies only to
conduct in the course of a search, seizure or arrest, or more broadly to all
activities undertaken by investigative officers, "because employees of
administrative agencies, no matter what investigative conduct they are
involved in, do not come within the §2680(h) exception." <u>Id</u>. However, we do
not extrapolate from this remark that a federal employee of the TSA—as an
"administrative agency"—can *never* be deemed an "investigative or law
enforcement officer" within the meaning of 2680(h). The Third Circuit has yet
to confront this question, or to clarify whether we should interpret the FTCA
provision by examining the association of federal employees with a particular
agency or division of government rather than their job functions.

16

searches that must comply with the Fourth Amendment. <u>United States v. Hartwell</u>, 436 F.3d 174, 177 (3d Cir. 2006)(holding that the warrantless searches of passengers conducted by TSOs are permissible under the administrative search doctrine).

Furthermore, liability for the tortious conduct of these federal employees appears to align with the legislative intent for the exception. In <u>Pooler v. United States</u>, 787 F.2d 868, 872 (3d Cir. 1986), the Third Circuit noted that the "investigative or law enforcement officer" exception to section 2680(h) was enacted in 1974 to address the problem of intentionally tortious conduct that occur during searches, seizures and arrests— activities during which "government agents come most directly in contact with members of the public." Sovereign immunity should be abrogated in these instances because "[t]he government places them in such a position, thereby exposing the public to a risk that intentionally tortious conduct may occur." <u>Id</u>. The Senate committee envisioned that the "amendment would submit the Government to liability whenever its agents act under color of law so as to injure the public through search and seizures that are conducted without warrants or with warrants issued without probable cause." <u>Id</u>. at 874 (Seitz, J., concurring)(quoting Sen. Rep. 93-588, *reprinted in* 1974 U.S. Code Cong. & Admin. News at 2791).

Thus, the "investigative or law enforcement officer"
exception may encompass those, who like TSOs, are empowered to
conduct warrantless searches of the public. Like our colleague
Judge Ludwig, who recently confronted this exact question, we
find discovery is needed to resolve whether the TSOs were
authorized to execute searches, seize evidence, or make arrests
such that the U.S. may be liable for their intentionally tortious
conduct under §2680(h). See George v. Rehiel, No. 10-586, Order
of October 28, 2011 (E.D. Pa. 2011), appeal docketed, No. 11-4292
(3d Cir. Dec. 16, 2011).

### 2. Whether the Alleged Misconduct Occurred In the Course of TSO's Execution of a Search

Even if TSA agents are considered "investigative or law
enforcement officers," Defendants argue that the intentional tort
claims are barred because the alleged misconduct did not occur
during a search, seizure, or arrest by the agents. See Pooler,
787 F.2d at 872. Plaintiffs themselves point out that TSO Labbee
told Pellegrino the search was over and she was free to proceed
from the screening area. However, Pellegrino was still packing
her things in the secured checkpoint area at the point that she
was detained and the criminal accusations were made. As this case
revolves around the disputed accounts of what happened during the
search of Pellegrino, and unless discovery indicates otherwise,
it appears to the Court that the search had not concluded at the
time of the alleged torts. See Defs. Mot. at 4 ("Abdul-Malik

18

conducted a pat-down of Pellegrino at that time, followed by a search of Pellegrino's carry-on baggage. It is at this juncture that the events culminating in this civil action occurred").

### 3. Whether Plaintiffs Sufficiently Pled False Arrest, False Imprisonment and/or Malicious Prosecution

We examine Plaintiffs' alleged claims of false arrest, false imprisonment, and malicious prosecution to determine whether she has sufficiently pled these claims assuming without deciding that the United States may be held liable under §2680(h).

#### i. False Arrest & False Imprisonment

"Under Pennsylvania law, the torts of false arrest and false imprisonment are essentially the same actions." Glass v. City of Phila., 455 F. Supp. 2d 302, 365 (E.D. Pa. 2006). Plaintiff must show that she was unlawfully detained by another person. Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010). Pellegrino alleges that TSO Labbee unlawfully confined her to the search table without cause while summoning the police. Neither Labbee nor Abdul-Malik believed Pellegrino committed any offense as the agents fabricated those very allegations. Thus, Plaintiff has sufficiently plead the elements of this claim.

#### ii. Malicious Prosecution

Plaintiff must demonstrate four elements to succeed in a malicious prosecution claim under Pennsylvania law: "(1) the institution of legal proceedings against the plaintiff, (2) without probable cause, (3) with malice, and (4) the proceedings

19

terminated in favor of the plaintiff." Clifton v. Borough of
Eddystone, 2011 U.S. Dist. LEXIS 115917 at *40 (E.D. Pa. Oct. 5,
2011)(citing Manley, 997 A.2d at 1241. A private citizen can be
liable for malicious prosecution if he "procured the prosecution
...by giving knowingly false information to a public official
that leads to the initiation of proceedings." Logan v. Salem
Baptist Church of Jenkintown, 2010 U.S. Dist. LEXIS 86916 at *7
(E.D. Pa. Aug. 17, 2010)(citing Hess v. Lancaster Cnty., 514 A.2d
681, 683 (Pa. Commw. Ct. 1986)).

TSOs initiated the criminal proceeding against Pellegrino by
pressing charges and those charges were terminated in her favor.
"The central issue at this point is whether the prosecution was
procured without probable cause, as a lack of probable cause will
allow this Court to infer the existence of malice." Logan, 2010
U.S. Dist. LEXIS 86916 at *8-9. Under Pennsylvania law, "[t]he
issue of probable cause is one for the court to decide, and it
should be found to exist if there was a 'reasonable ground of
suspicion supported by circumstances sufficient to warrant an
ordinary prudent man in the same situation in believing that the
party is guilty of the offense.'" Id. at *6 (quoting Miller v.
Pa. R.R. Co., 89 A.2d 809, 811-12 (Pa. 1952)).

Defendants argue there was probable cause based on the
statements of two complaining witnesses and a third non-
complaining witness. However, Pellegrino alleges that the TSOs

20

knew these statements were false and made them solely to procure her prosecution. "[I]f the accusations were known to be false, then Defendants simply cannot be described as acting with probable cause." <u>Logan</u>, 2010 U.S. Dist. LEXIS 86916 at *9. Although Plaintiff will be required to prove either that the information that prompted the filing of charges was false, she has adequately plead that the agents procured her prosecution without probable cause and we will not dismiss the claim at this stage. <u>See</u> <u>Merkle v. Upper Dublin Sch. Dist.</u>, 211 F.3d 782, 794-95 (3d Cir. 2000); <u>Collins v. Christie</u>, 2008 U.S. Dist. LEXIS 53233 at *46-50 (E.D. Pa. July 11, 2008).

## C. <u>Civil Conspiracy</u>

To state a cause of action for civil conspiracy, the plaintiff must demonstrate: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." <u>Gen. Refractories Co. v. Fireman's Fund Ins. Co.</u>, 337 F.3d 297, 313 (3d Cir. 2003)(citation and internal quotations omitted). Moreover, an "actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor." <u>Levin v. Upper Makefield Twp.</u>, 90 Fed. Appx. 653, 667 (3d Cir. 2004) (citing <u>In re Orthopedic Bone Screw Prods. Liab. Litig.</u>,

193 F.3d 781, 789 (3d Cir. 1999)). In the end, "only a finding that the underlying tort has occurred will support a claim for civil conspiracy." Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 506 (E.D. Pa. 2008).

Pellegrino avers that Labbee and Abdul-Malik agreed while in the private screening room to accuse Pellegrino of a fabricated assault. While the parties dispute whether the assault took place, there is no dispute that the TSOs summoned the police to arrest Pellegrino and then ultimately pressed charges against her as complaining witnesses. Because Plaintiff adequately pled claims of malicious prosecution and false arrest/imprisonment through the misconduct of TSA employees, Plaintiff has therefore also pled a charge of civil conspiracy under the FTCA.

## D. **Defamation**

Plaintiffs complain that their reputations have been significantly damaged by the verbal and written statements by the TSOs to the TSA, the statements made by the TSOs while under oath in the criminal proceedings, and a newspaper story later published by the Philadelphia Inquirer about the incident. However, Plaintiffs have no viable claim for defamation. The FTCA provides the exclusive remedy for tortious conduct of federal employees acting in the course of their employment, and the FTCA explicitly and absolutely bars claims such as Plaintiffs', which arise out of slander or libel. 28 U.S.C. §2680(h). Moreover, the

22

testimony of individuals while under oath in criminal
proceedings, however offensive to Plaintiffs or potentially
untrue, cannot provide the foundation for a defamation action.
Burns v. Reed, 500 U.S. 478, 489 (1991)(quoting Briscoe v. LaHue,
460 U.S. 325, 332 (1983)).

E. **Intentional and/or Negligent Infliction of Emotional Distress**

     While we do not doubt that Plaintiffs are distressed by this
ordeal, they have failed to demonstrate the necessary elements
for claims of either intentional or negligent infliction of
emotional distress.

     Pennsylvania recognizes claims for intentional infliction of
emotional distress in narrowly defined circumstances where an
individual intentionally or recklessly causes severe emotional
distress to another by extreme and outrageous conduct that goes
"beyond all possible bounds of decency...and [is] utterly
intolerable in a civilized society." Ruder v. Pequea Valley Sch.
Dist., 790 F. Supp.2d 377, 397 (E.D. Pa. 2011)(citations
omitted). "[I]t has not been enough that the defendant has acted
with intent which is tortious or even criminal, or that he has
intended to inflict emotional distress, or even that this conduct
has been characterized by malice...'" Hoy v. Angelone, 720 A.2d
745, 754 (Pa. 1998)(citations omitted). Nothing alleged in
Plaintiffs' Complaint comes even remotely close to the extreme
and outrageous conduct that gives rise to a claim for intentional

infliction of emotional distress under Pennsylvania law.[12]

Likewise, Plaintiffs' Complaint fails to allege necessary elements for a claim of negligent infliction of emotional distress. "In all cases, a Plaintiff who alleges negligent infliction of emotional distress must suffer *immediate* and *substantial* physical harm." <u>Doe v. Phila. Cmty. Health Alts. Aids Task Force</u>, 745 A.2d 25, 28 (Pa. Super. Ct. 2000) (emphasis in original). Plaintiffs have failed to indicate a physical injury, let alone an immediate and substantial one.[13]

## II. Claims Against TSOs for Constitutional Violations Pursuant to *Bivens*

Pellegrino alleges violations of an array of her civil rights by the TSA agents in the course of the airport screening, the detention by the TSA, and throughout the subsequent arrest, detention and prosecution of Pellegrino for criminal charges. All claims for violations of constitutional rights by federal employees acting under the color of federal law must be brought pursuant to <u>Bivens v. Six Unknown Fed. Bureau of Narcotics Agents</u>, 403 U.S. 388 (1971). As such, we construe Plaintiff's claims under §1983 as *Bivens* claims. See <u>Harper v. Beard</u>, 2007 U.S. Dist. LEXIS 87631, at *12-13 (E.D. Pa. Nov. 28, 2007), *aff'd*

---

[12] <u>See, e.g.</u>, <u>Johnson v. Caparelli</u>, 625 A.2d 668, 672 (Pa. Super. Ct. 1993)(priest's sexually abused an alter boy); <u>Field v. Phila. Elec. Co.</u>, 565 A.2d 1170, 1183-84 (Pa. Super Ct. 1989) (defendant deliberately vented highly radioactive steam on plaintiff and then attempted to conceal overexposure to radiation).
[13] We also note that much of the distress Plaintiffs describe stems from the alleged defamatory actions of TSA agents, and as such "arises out of" an enumerated exception and is barred under §2680(h) of the FTCA.

326 Fed. Appx. 630 (3d Cir. 2009). Furthermore, there can be no *Bivens* cause of action for alleged constitutional violations against a federal agency directly, or against federal employees acting in their official capacities. See <u>F.D.I.C. v. Meyers</u>, 510 U.S. 471, 477-86 (1994).

Any possible *Bivens* claims against TSA agents in their individual capacities arising out of actions on the date of the incident are untimely. "A *Bivens* claim accrues when the plaintiff knows, or has reason to know, of the injury that forms the basis of the action." <u>Wooden v. Eisner</u>, 143 Fed. Appx. 493, 494 (3d Cir. 2005) (citing <u>Sameric Corp. v. City of Phila.</u>, 142 F.3d 582, 599 (3d Cir. 1998)). Plaintiff knew or should have known that she suffered an injury at the hands of Defendants on July 29, 2006. Accordingly, this is the trigger date for the two-year period in which Plaintiff could bring *Bivens* claims for constitutional harms arising out of the incident. See <u>Napier v. Thirty or More Unidentified Fed. Agents</u>, 855 F.2d 1080 (3d Cir. 1988) (holding that *Bivens* actions are governed by the applicable state law statute of limitations); <u>Haugh v. Allstate Ins. Co.</u>, 322 F.3d 227, 233 (3d Cir. 2003)(noting that the Pennsylvania limitations period in tort cases is two years). Plaintiff did not file this action until November 18, 2009, long after the statute of limitations expired.

Claims for constitutional violations resulting from

malicious prosecution, however, do not accrue until the termination of the criminal proceedings. See Kadonsky v. New Jersey, 188 Fed. Appx. 81, 85 (3d Cir. 2006). The Philadelphia Municipal Court dismissed the criminal case against Pellegrino on March 28, 2008. Only claims pertaining to malicious prosecution by the TSA Defendants are timely before this Court.

## A. Malicious Prosecution

In order to state a claim for malicious prosecution under *Bivens*, Pellegrino must allege deprivation of a qualifying constitutional right. See Backof v. N.J. State Police, 92 Fed. Appx. 852, 857 (3d Cir. 2004). She lists several and we assess each basis for malicious prosecution in turn.

### 1. First Amendment

A *Bivens* action may be brought against federal employees for inducing criminal prosecution against an individual in retaliation for that individual's exercise of the First Amendment right to free speech. Hartman v. Moore, 547 U.S. 250, 256 (2006). In order to establish a retaliatory prosecution claim, a plaintiff must plead "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006). In addition, a plaintiff must plead, and

26

ultimately prove, the absence of probable cause supporting the
prosecution. Hartman, 547 U.S. at 265-66.

According to the Complaint, Pellegrino informed TSOs Labbee
and Abdul-Malik that she intended to report their actions to
their supervisors. Immediately, the TSOs decided to press
fabricated criminal charges against Pellegrino in retaliation for
this comment and to deter Pellegrino from making such a report.
The threat of a criminal conviction for felony and misdemeanor
offenses amounts to retaliatory action sufficient to deter a
person of ordinary firmness from engaging in constitutionally
protected speech. Miller v. Mitchell, 598 F.3d 152 (3d Cir.
2010). The timing of the criminal charges is "unduly suggestive"
and demonstrates the necessary causal connection for this claim.
See Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).
Finally, Pellegrino's statements may constitute constitutionally
protected speech.[14]

Defendants argue that this claim fails because Pellegrino
has not alleged an absence of probable cause. The U.S. Supreme
Court explored circumstances similar to those before us in
Hartman v. Moore, 547 U.S. 250 (2006). In Moore, plaintiff
brought a _Bivens_ action for malicious prosecution in violation of
his First Amendment rights, arguing that postal inspectors
engineered a criminal investigation and prosecution against him

---

[14] Defendants do not question whether Pellegrino engaged in protected speech
and so for the time being neither shall we.

in retaliation for his criticism of the Postal Service. <u>Id</u>. at
254. The Court noted that given prosecutorial immunity, the
defendant in a *Bivens* action for retaliatory prosecution will be
an individual "who may have influenced the prosecutorial decision
but did not himself make it, and the cause of action will not be
strictly for retaliatory prosecution, but for successful
retaliatory inducement to prosecute." <u>Id</u>. at 262. As such, the
plaintiff "must also show that he induced the prosecutor to bring
charges that would not have been initiated without his urging" by
demonstrating an absence of probable cause to proceed. <u>Id</u>.[15]

Plaintiff avers that three maliciously fabricated witness
statements formed the sole basis for the prosecutor's decision to
move forward in the case against her. A report based on a
credible account from a reliable witness to the alleged crime may
sufficiently establish probable cause, and under such
circumstances, there is no requirement to validate this
conclusion through further investigation. <u>See</u> <u>Merkle</u>, 211 F.3d at
790 n.8.[16] But, the Complaint before us raises a question as to
whether the police officers and prosecutors involved in this case

---

[15] We also note that "[t]he existence of probable cause to arrest...does not
foreclose plaintiff's malicious prosecution claim." <u>Gagliardi v. Fisher</u>, 513
F. Supp. 2d 457, 481 (W.D. Pa. 2007). There must be probable cause to initiate
prosecution for each of the criminal charges. <u>Johnson v. Knorr</u>, 477 F.3d 75,
85 (3d Cir. 2007).

[16] Plaintiff also alleges that the police failed to interview other available
witnesses on the scene, to listen to her account of the incident and to watch
"instantly available" surveillance video of the area before arresting her.
Compl at 28. None of these activities were required to formulate probable
cause for the arrest and prosecution of Pellegrino. <u>See</u> <u>Orsatti v. N.J. State
Police</u>, 71 F.3d 480, 482-483 (3d Cir. 1995).

had reasonably trustworthy information of the sort that would warrant a prudent person concluding that the suspect committed the charged offenses. See United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002). The dismissal of several of the criminal charges at the preliminary hearing stage lends further support to Plaintiff's allegation that there was an absence of probable cause to prosecute her for the offenses. While Plaintiff has the burden of showing that the prosecutor relied solely on untrustworthy false information from the TSOs in deciding to prosecute her, we find that she has sufficiently pled an absence of probable cause to proceed at this juncture. See Phillips v. Alsleben, 2009 U.S. Dist. LEXIS 20241, at *14-17 (E.D. Pa. Mar. 12, 2009); Suter v. Petrone, 2006 U.S. Dist. LEXIS 36369 at *13-14 (W.D. Pa. Mar. 14, 2006).

### 2. Fourth Amendment

To prove malicious prosecution under the Fourth Amendment, a plaintiff must show that: "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of the legal proceeding." Johnson v. Knorr, 477

F.3d 75, 81-82 (3d Cir. 2007). We have already resolved the first four elements and turn directly to the fifth.[17]

"[A] Fourth Amendment malicious prosecution claim is intended to redress 'the deprivation of liberty accompanying prosecution, not prosecution itself.'" Bingaman v. Bingaman, 2009 LEXIS 68448 at *11 (M.D. Pa. Aug. 5, 2009)(quoting DiBella v. Borough of Beachwood, 407 F.3d 599, 603 (3d Cir. 2005)). "Compulsory attendance at trial, by itself, does not meet the deprivation of liberty requirement." Clifton, 2011 U.S. Dist. LEXIS 115917 at *36. However, onerous pretrial restrictions, such as posting bail or submitting to travel restrictions, may amount to a sufficient deprivation of liberty for a malicious prosecution claim. See, e.g., Gallo v. City of Phila., 161 F.3d 217, 222-23 (3d Cir. 1998). Here, Plaintiff alleges that she was held for 18 hours in a detention cell after her arrest. Her husband posted bail for her release, though she does not indicate the amount paid. As a Florida resident, she paid to travel to court proceedings in the Philadelphia Municipal Court during the 20 month pendency of her criminal case. This suffices to proceed with the claim at this stage.

---

[17] Defendants argue that Pellegrino cannot establish that a termination of the criminal case in her favor because the acquittal resulted from the suppression of evidence. Mot. at 21-22. This misrepresents the governing law. "Favorable termination of some but not all individual charges does not necessarily establish the favorable termination of the criminal proceeding as a whole." Kossler v. Crisanti, 564 F.3d 181, 188 (3d Cir. 2009). In sharp contrast to Kossler, upon which Defendants rely, there was not a contemporaneous conviction in Pellegrino's case; all charges terminated in her favor.

### 3. Sixth Amendment

The only discernable alleged violation of the Sixth Amendment in Plaintiff's Complaint is that her right to compulsory process to obtain witnesses in her favor was violated by TSA Officers' destruction or withholding of surveillance video tapes, which she personifies as a witness in her defense. We need not assess whether these videotapes constitute "witnesses" because the "Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses; it guarantees him compulsory process for obtaining witnesses in his favor." United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)(internal citation omitted). Pellegrino does not allege that TSA employees engaged in a scheme to deny her right to subpoena witnesses in her favor, and thus there is no alleged violation of her constitutional right to compulsory process. See Mayfield v. Montgomery Cnty. Corr. Facility, 2008 U.S. Dist. LEXIS 52012 at *11-12 (E.D. Pa. July 2, 2008). Moreover, the unnamed TSA employees who allegedly withheld or destroyed the video recordings did not participate in the initiation of the criminal proceedings against Pellegrino and therefore cannot be liable for malicious prosecution.[18]

### 4. Fifth and Fourteenth Amendments

---

[18] Pellegrino also alleges a distinct claim against the unnamed TSA employee(s) who destroyed or lost the video surveillance evidence, arguing that this was done to intentionally interfere with her procedural due process and compulsory process rights. Any such claim, even if timely, fails because she has not plead a deprivation of these rights, as discussed in this Opinion.

As the Fourteenth Amendment only applies to the actions of the states, it is inapplicable here. Brown v. Philip Morris Inc., 250 F. 3d 789, 800 (3d Cir. 2001). Plaintiff's attempt to plead a malicious prosecution claim under the Fifth Amendment also fails. The Third Circuit has stated that a claim may be based on procedural due process. Backof, 92 Fed. Appx. at 856 n.6; Torres v. McLaughlin, 163 F.3d 169, 173 (3d Cir. 1998). However, Plaintiff cannot establish a denial of procedural due process. Even if we construe the Complaint as seeking to invoke substantive due process, this would provide no basis for relief. See Albright v. Oliver, 510 U.S. 266 (1994).

## B. "Aiding and Abbeting" Malicious Prosecution

Plaintiff argues that several Doe TSA employees aided and abetted the malicious prosecution against her in the following ways: (1) failing to intervene and to prevent her arrest on July 29, 2006; (2) deliberately identifying this incident as a "500 Report Code"—one involving a disruptive and unruly passenger—in TSA's own internal categorization of reports and thereby creating an inaccurate record that formed the basis for her prosecution; (3) providing assistance and counsel to Labbee and Abdul-Malik in preparing to testify at the criminal proceeding; and (4) failing to preserve video evidence of what transpired at the checkpoint.

We are unaware of any legal basis for a constitutional claim under *Bivens* for aiding and abetting a malicious prosecution.

"Aiding and abetting" is typically a basis for criminal, rather than civil, liability. See Petro-Tech, Inc. v. Western Co. of N. Am., 824 F.2d 1349, 1356 (3d Cir. 1987). Even if there was such a possible claim, and it remained timely, we do not imagine that the above actions would form the basis for liability.[19]

## C. Conspiracy to Deprive Civil Rights

To state a claim for conspiracy, Plaintiff must provide a factual basis to support the allegations that Defendants acted in concert and agreement with one another to deprive her of her constitutional rights. Capogrosso v. Supreme Court of N.J., 588 F.3d 180, 185 (3d Cir. 2009). "It is not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997). A civil conspiracy to violate constitutional rights requires a "meeting of the minds" regarding that conspiracy. Startzell v. City of Phila., 533 F.3d 183, 205 (3d Cir. 2008).

While Pelegrino maintains that the actions of Jane and John Doe TSOs deprived her of her constitutional rights, she fails to allege a factual basis for her bald contention that these TSOs reached an *agreement* to take these actions for this purpose. The

---

[19] We note that the Department of Justice does not authorize representation for John or Jane Doe Defendants in their individual capacities, and argued for dismissal of this claim against unnamed TSA agents in their official capacities only. The claims are meritless regardless.

allegations do not rise above bare assertions and conclusory
suspicions. The only fact Plaintiff alleges that supports a claim
of mutual understanding or agreement is that TSOs Labbee and
Abdul-Malik decided together while alone in the private screening
room to both accuse her of assaulting them. Even the allegation
that TSO Kissinger voluntarily joined the conspiracy by claiming
to have witnessed the incident does not suffice; at most, this
suggests conscious parallelism. Thus, we dismiss Plaintiff's
conspiracy charges against all Defendants except for Labbee and
Abdul-Malik. While Pellegrino knew that these agents were engaged
in a conspiracy against her on July 29, 2006, "it is difficult to
see how a cause of action for conspiracy to prosecute maliciously
could have accrued before that date" given that the predicate
malicious prosecution claims did not accrue until favorable
termination. Rose v. Bartle, 871 F.2d 331, 352 (3d Cir. 1989).
See also Wiltz v. Middlesex Cnty. Office, 249 Fed. Appx. 944, 949
(3d Cir. 2007). The conspiracy charge is therefore limited to the
alleged malicious prosecution.

## III. Claims under Section 1985(3)

42 U.S.C. § 1985(3) "permits an action to be brought by one
injured by a conspiracy formed for the purpose of depriving,
either directly or indirectly, any person or class of persons of
the equal protection of the laws, or of equal privileges and
immunities under the laws." Farber v. City of Paterson, 440 F.3d

34

131, 134 (3d Cir. 2006). The Supreme Court has established that
§1985(3) is limited to private conspiracies predicated on
"racial, or perhaps otherwise class based, invidiously
discriminatory animus." Griffin v. Breckenridge, 403 U.S. 88, 102
(1971). "[A] plaintiff must allege both that the conspiracy was
motivated by discriminatory animus against an identifiable class
and that the discrimination against the identifiable class was
invidious." Farber, 440 F.3d at 135.

The Complaint does not conceivably meet this test. Rather,
it simply notes differences in race and age: "Plaintiff was
treated different from other passenger as a result of Abdul-
Malik's perceptions. Abdul-Malik (African American and approx 25
yrs. old) and Pellegrino (Caucasian and 57 yrs. old at the
time)." Compl. at 13, n.30. Pellegrino claims that "[s]alient
physical characteristics of race and age differences cannot be
excluded from Abdul-Malik's motivations for animus and
discrimination against Pellegrino." Pl. Resp. at 6. We refuse to
stretch these passing, conclusory remarks into a fact-based
allegation that the TSOs conspired to deprive Pellegrino of her
constitutional rights on the basis of her race.[20]

---

[20] We also dismiss Plaintiff's attempt to allege a claim under 42 U.S.C. §1988
because this provision "does not create an independent federal cause of
action; it is merely intended to complement the various acts which do create
federal causes of action for the violation of federal rights." Tunstall v.
Office of Judicial Support of Court of Common Pleas, 820 F.2d 631, 633 (3d
Cir. 1987)(explaining Moor v. County of Alameda, 411 U.S. 693, 702 (1973)).

**IV. Claim for Failure of TSA to Investigate Civil Rights Complaint Pursuant to Administrative Procedures Act (APA)**

6 U.S.C. §345(a)(6) requires the Officer for Civil Rights and Civil Liberties under the Secretary for the Department of Homeland Security (DHS) to "investigate complaints and information indicating possible abuses of civil rights or civil liberties." However, Plaintiffs do not allege that the DHS Officer for Civil Rights and Civil Liberties received and ignored their complaints. Rather, Plaintiffs argue that the TSA should have construed their SF-95 administrative claim for tort damages as notice of abuse of civil rights and liberties to be handled by the TSA and/or DHS officers charged with protecting civil rights and liberties under 6 U.S.C. §345(a)(6). Plaintiffs maintain that the failure to do so is actionable under the Administrative Procedures Act (APA), 5 U.S.C. §§701 *et seq.*

We agree with Defendants that there is no identifiable requirement that the TSA survey administrative tort claims for constitutional issues and present these to DHS's Officer for Civil Rights and Civil Liberties on behalf of the complainant. Thus, there is no viable claim under the APA. See <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 63 (2004)("[T]he only agency action that can be compelled under the APA is action legally *required*").[21]

---

[21] We also reject Plaintiffs' request for relief for these actions under the Declaratory Judgment Act (DJA), 28 U.S.C. §§2201 *et seq.*

36

**V. Claim for Failure to Comply with Plaintiffs' Request for Information Pursuant to the Freedom of Information Act (FOIA) and the Privacy Act**

The Freedom of Information Act (FOIA) requires disclosure of government records to individuals who follow the outlined procedures for requesting information unless the information falls within one of the nine statutory exceptions. 5 U.S.C. § 552(b). Similarly, the Privacy Act allows an individual to gain access to any information pertaining to her in an agency's records upon request. 5 U.S.C. § 552a(d)(1). This Court has jurisdiction to compel disclosure of records from a federal agency only when the records were improperly withheld. Kissinger v. Reporters Comm. for Freedom of Press, 445 U.S. 136 (1980). When a plaintiff properly alleges an agency's failure to fully disclose as required under FOIA or the Privacy Act, "the court may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions." 5 U.S.C. §§ 552(a)(4)(B), 552a(g)(3)(A). However, before presenting a claim under FOIA to the district court, plaintiffs must first exhaust administrative remedies. McDonnell v. United States, 4 F.3d 1227, 1240 (3d Cir. 1993); see 5 U.S.C. § 552(a)(6)(A)(i).[22] A person making a request for information pursuant to FOIA "shall be deemed to have

---

[22] There is no statutory requirement of exhaustion before pursuing a claim in the district court for the failure to comply with a request for records under the Privacy Act. See 5 U.S.C. § 552a(d). "To the extent exhaustion of administrative remedies is required, it is not a jurisdictional prerequisite." Wadhwa v. VA, 342 Fed. Appx. 860, 862 (3d Cir. 2009).

37

exhausted his administrative remedies...if the agency fails to comply with the applicable time limit provisions." 5 U.S.C. §552(a)(6)(C)(I).

Plaintiffs[23] appear to have followed the proper procedures for commencing an action in this Court based on their FOIA and Privacy Act requests to the TSA. The TSA acknowledged receipt of the request on June 5, 2009. At the time Plaintiffs commenced this lawsuit in November 2009, the agency had not responded or produced any records. On December 29, 2009, the TSA finally responded to the request and reported that there are 375 pages pertaining to Pellegrino in TSA's records. The TSA withheld 303 of these pages while also censoring some of the released information in the 72 pages turned over to Plaintiffs. When Plaintiffs filed an administrative appeal, the TSA indicated that they would not consider the appeal while the current action is pending. Then, on August 28, 2011, the TSA forwarded a supplemental release of documents to Plaintiffs pursuant to their initial request in May 2009. As a result of this substantially delayed release, there remain only 90 pages related to Pellegrino that have not been disclosed to Plaintiffs. Since it appears that

---

[23] "FOIA creates a private cause of action for the benefit of persons who have requested certain records from a public agency and whose request has been denied," whether or not the person has a personal stake in the information sought. McDonnell, 4 F.3d at 1237-38; 5 U.S.C. § 552(a)(3). If Waldman's name appears alongside Pellegrino's on the requests for records submitted to the TSA, as the Plaintiffs allege, then he also has standing to pursue this claim. However, only Pellegrino has standing to pursue a claim under the Privacy Act for the failure of the TSA to provide full and appropriate access to records relating to her. See 5 U.S.C. §552a(d)(1).

the delayed release was the fault of the TSA, not a result of additional or revived FOIA requests by Plaintiffs, the FOIA claim still satisfies constructive exhaustion requirements. Cf. McDonnell, 4 F.3d at 1240.

"[W]hen an agency has released documents, but other related issues remain unresolved, courts frequently will not dismiss the action as moot." Baker v. U.S. Dep't of Homeland Sec., 2012 U.S Dist. LEXIS 8718 at *10-11 (M.D. Pa. Jan. 24, 2012) (quoting McKinley v. FDIC, 756 F. Supp. 2d 105, 110 (D.D.C. 2010)). We find ourselves in this position given that Plaintiffs continue to object that information has been wrongfully withheld. As such, this Court retains jurisdiction over this matter to assess TSA's disclosures. We direct Defendant TSA to submit a Vaughn Index to clarify the basis for withholding the remaining documents. See Coastal States Gas Corp. v. Dep't of Energy, 644 F.2d 969, 984 (3d Cir. 1981); Amro v. U.S. Customs Serv., 128 F. Supp. 2d 776, 790 (E.D. Pa. 2001). The agency has the burden to demonstrate the adequacy of the FOIA disclosure, and "must provide reasonably specific information that explains how the exemption applies." Cozen O'Connor v. U.S. Dep't of Treasury, 570 F. Supp. 2d 749, 765 (E.D. Pa. 2008).[24]

---

[24] We will review the TSA's decision to withhold these pages de novo, analyzing the propriety of the decision under FOIA and the Privacy Act simultaneously as information exempted under FOIA is also exempted under the Privacy Act. See Makky v. Chertoff, 489 F. Supp. 2d 421, 440 (D.N.J. 2007).

## VI. Claim for Failure to Correct False Records Pursuant to Privacy Act

The Privacy Act provides the sole remedy for Plaintiff's allegations that the TSA maintains fraudulent, inaccurate and incomplete information in her record. See Comp. at 45-50. Under the Privacy Act, a federal agency must "permit [an] individual to request an amendment of a record pertaining to him...which the individual believes is not accurate, relevant, timely, or complete." 5 U.S.C. § 552a(d)(2)(B)(I). The right to examine records about oneself is separate from the right to amend those records if inaccurate, irrelevant, untimely or incomplete. While there may not be a statutory requirement of exhaustion related to a request to access records under the Privacy Act, there is a prerequisite administrative process for amending records. See Quinn v. Stone, 978 F.2d 126, 137 (3d Cir. 1992). Pellegrino has a potential cause of action if she demonstrates that she made a request for amendment of a record, such request was denied, and a subsequent administrative appeal was also denied. See 5 U.S.C. § 552a(d). However, Pellegrino never states that she followed the statutorily established procedures to seek an amendment of these records. Unlike her requests for the disclosure of information, it is not clear from the Complaint when or how Pellegrino requested information to be removed from or amended in her record, when or if the TSA responded to this request, and when or if Pellegrino appealed any adverse agency decision through

40

administrative channels. We are left to infer that she has not done so. Where, as here, exhaustion of administrative remedies is statutorily mandated, the failure to exhaust administrative remedies deprives the district court of jurisdiction to hear the claim. See Duvall v. Elwood, 336 F.3d 228, 234 (3d Cir. 2003).

## CONCLUSION

This Court carefully reviewed the pleadings for any potentially viable claims. We determine that the recognized claims comprise the whole of possible actions Plaintiffs may have arising out of the incidents described above. To the extent Plaintiffs intended to allege claims not discussed in this Opinion, insofar as we cannot discern what those claims might be, we find that they are not viable and are properly dismissed. An order follows.