**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

NADINE PELLEGRINO AND  
HARRY WALDMAN,                  :
                                :
              Plaintiffs,       :   CIVIL ACTION
                                :
        v.                      :   NO. 09-5505
                                :
UNITED STATES OF AMERICA        :
TRANSPORTATION SECURITY         :
ADMINISTRATION, et. al.,        :
                                :
              Defendants.       :

**MEMORANDUM & ORDER**

JOYNER, J.                              APRIL    16, 2014

     Before the Court are Defendants' Motion for Summary Judgment (Doc. No. 156) and Plaintiffs' Exhibits Filed Under Seal (Doc. No. 173).[1] For the reasons outlined in this Memorandum, it is hereby ORDERED that the Motion is GRANTED in part and DENIED in part.

**I.        BACKGROUND**

     On the evening of July 29, 2006, Plaintiff Nadine Pellegrino ("Pellegrino") and her husband Harry Waldman arrived at the Philadelphia International Airport (PHL) in order to catch a flight home to Florida. (Def. Mot. for Summary Judgment, Ex. A, Deposition of Nadine Pellegrino at 68). At the security

---

[1] The Plaintiffs requested and received five extensions of time to file their response in opposition to Defendants' Motion for Summary Judgment. See (Doc. Nos. 160, 163, 166, 168, 170). To date, the Court has received from Plaintiffs only two exhibits filed under seal. See (Doc. No. 173). The Court considers these exhibits in its analysis.

checkpoint, Pellegrino was directed by a Transportation and Security Administration ("TSA") employee to step aside for further screening. Id. at 77. She had three bags with her: a rolling tote, a rolling bag that fit in the overhead compartment of the airplane, and a snap-on black canvas handbag. Id. at 72. A male TSA employee placed Pellegrino's bags on a search table and began to open one of them. Id. at 83. Pellegrino informed the employee that she desired a private screening. Id. In Pellegrino's mind, a private search did not mean a behind-closed-doors search; it meant a female to search her bags. Id. at 146.

Defendant Transportation Security Officer ("TSO") Nuyriah Abdul-Malik arrived at the checkpoint to complete Pellegrino's screening. Id. at 88-89. Abdul-Malik was wearing gloves when she arrived. Id. at 90. Believing that TSA screening procedures require TSOs to change their gloves upon request, Pellegrino requested that Abdul-Malik change her gloves before handling Pellegrino's luggage. Id. at 90-91. Abdul-Malik complied, but in the process physically contaminated the new set of gloves. Id. at 94. Pellegrino sees her request for the glove change as the catalyst for what she perceived as Abdul-Malik's ensuing "negative attitude" toward Pellegrino. Id. at 96.

Wearing her new gloves, Abdul-Malik then relocated Pellegrino's three bags to a private screening location, a thin-walled partitioned cubicle with a door. Id. at 96-98. In the

2

screening room, Pellegrino and Abdul-Malik were joined by
Defendant Laura Labbee ("Labbee"), a supervisor at the
checkpoint, and Denise Kissinger ("Kissinger"), a TSO. Id. at 99-
100. They closed the door behind them. Kissinger performed a swab
of the front and back of Pellegrino's shirt. Id. at 101.
Kissinger then left the room to test the samples. Id.

Abdul-Malik then examined the contents of Pellegrino's
luggage. Id. at 102. Pellegrino maintains that Abdul-Malik's
inspection was unduly thorough and rough. Id. at 102-104. She
allegedly counted all of the currency and coins; examined the
front and back of each of Pellegrino's membership, credit, and
other cards; looked at Pellegrino's cellphone data; read her
personal notes and rifled through her papers; and opened and
smelled her cosmetics, hand sanitizer, mints, pen and lipstick.
Id. at 102-104. Abdul-Malik also left open the lids to various
containers, causing their contents to spill inside Pellegrino's
bags and damage her property. Id.

Pellegrino informed Labbee that she planned to report the
TSOs' treatment of her to TSA superiors. Abdul-Malik stood by
passively as an observer while this occurred. Id. at 110.

Pellegrino further alleges that Abdul-Malik caused property
damage when returning her belongings to the bags; she punched,
jammed, and forced these items back into Pellegrino's luggage.
Id. at 112-113. When attempting to close one bag, Abdul-Malik

used her knee and body weight to compress the contents and
forcibly yanked on the zipper, damaging the luggage in the
process. Id. at 113. She also damaged jewelry and a pair of eye-
glasses. Id. at 112. Abdul-Malik then placed the tote bag
underneath the far back corner of the search table. Id. at 114.
In response, Pellegrino demanded to know "what is going on here,
both of you are behaving like bitches." Id. at 114. Pellegrino
states that Abdul-Malik then asked Labbee to summon the police.
Id. at 114. The police were not called at that time. Id. at 115.

Abdul-Malik then screened Pellegrino's larger rolling bag.
Id. at 116. Pellegrino asked a few times to be able to repack her
clothes, but was told she would have to wait until the end of the
search. Id. at 118.  Kissinger, who had re-entered the room,
removed three pairs of shoes for swabbing. Id. at 118-119. Once
the screening was complete, Labbee informed Pellegrino that she
was free to pack her things and leave the screening area. Id. at
120-121. After asking Abdul-Malik if she was going to repack her
shoes and receiving a negative response, id. at 122, Pellegrino
proceeded to remove her items to a search table outside the
private screening room. Id. at 123. As Pellegrino removed her
items, TSOs Labbee and Abdul-Malik remained in the screening
room. See id. at 125-129.

Pellegrino began by tossing her footwear from the threshold
of the doorway to the search room onto the floor of the

4

checkpoint, after checking to make sure there was no one in the immediate vicinity. Id. at 123-124. Pellegrino then carried her largest bag out of the screening room. Id. at 125. Due to the large size of the bag, Pellegrino had to carry it close to her chest and rotate it somewhat to navigate the doorway. Id. at 125; (Doc. No. 173, Pl. Ex. 187). Labbee avers that Pellegrino struck her in the stomach with the bottom of the bag as she was removing the bag from the room, an allegation corroborated by Kissinger (Def. Ex. B, Deposition of Denise Kissinger, at 145) but denied by Pellegrino. Pellegrino Dep. at 128. Labbee and Pellegrino were inside the private room when Labbee was struck, and Kissinger witnessed the event through the open door. Kissinger Dep. at 147. Pellegrino alleges that one or both of TSOs Labbee and Abdul-Malik disposed of three of Pellegrino's footwear covers into a trashcan without Pellegrino's permission. Pellegrino Dep. at 164.

Lastly, Pellegrino returned for her smaller rolling bag. Id. at 126. Pellegrino maintains that Abdul-Malik blocked her access to the bag, forcing Pellegrino to crawl under the table on her hands and knees to reach it and then roll it out of the room. Id. at 126. As Pellegrino grabbed the strap of the bag, the bag tipped over, striking the ground with a loud noise. Id. Abdul-Malik asserts that Pellegrino struck her in the leg in the process of collecting the bag, which Pellegrino denies. Id. at 128. As she left the room, Pellegrino avers that she heard Abdul-

Malik and Labbee say to each other that they had been assaulted by Pellegrino. Id. at 128. Pellegrino heard them each say to one another, "you saw her hit me, didn't you?" and then confirm the answer. Id. at 150.

Labbee then informed Abdul-Malik that Labbee intended to press charges, and asked Abdul-Malik if she wanted to do so as well. (Doc. No. 173, Pl. Ex. 167). Abdul-Malik answered that she did want to press charges and walked with Labbee to the supervisor's station to do so. Id.

While Pellegrino repacked her bags at the checkpoint search table, Labbee directed her to stay at the checkpoint while the police were summoned. Id. at 129. Pellegrino requested that the TSA official in charge at PHL be called to the checkpoint, but her request went unheeded. Id. Labbee confiscated Pellegrino's driver's license, id., and responding police officers arrested Pellegrino. Pellegrino did not hear what was said to the arresting officers prior to her arrest. Id. at 136-137. Abdul-Malik and Labbee, but not Kissinger, swore out criminal complaints against Pellegrino. (Doc. No. 173). Kissinger wrote out a witness statement to the police corroborating the allegation that Pellegrino struck Labbee with her bag. Kissinger Dep. 145, 169, 179-80. The Incident Reports of the arresting Philadelphia police officer note that Abdul-Malik and Labbee reported being struck by Pellegrino's bags and the shoes she had

tossed out of the private room, and that they suffered from a stomach bruise and leg pain as a result. <u>See</u> (Doc. No. 173). The police officer frisked Pellegrino in the private screening room, handcuffed her, and escorted her out of the airport in view of other passengers. Pellegrino Dep. at 154.

Pellegrino was initially charged with ten criminal violations, including felony aggravated assault, and misdemeanor charges of possessing instruments of a crime, making terroristic threats, simple assault, and recklessly endangering another person. (Def. Mot. at 6 n. 2). Pellegrino's husband posted a $400 bond and Pellegrino was released roughly eighteen hours later. Pellegrino Dep. at 158. Two felony counts were dismissed shortly thereafter. (Def. Mot. at 6).

In August 2006, Pellegrino was informed by letter that the TSA was considering imposing a civil penalty for her actions on June 29, 2006. Id. at 159; (Def. Ex. C). Pellegrino retained an attorney, who asked that evidence be preserved by the TSA. (Def. Ex. D). The TSA informed Pellegrino and the Philadelphia Municipal Court presiding over the criminal charges that no video recording of the June 29, 2006 events existed. (Def. Exs. E, F). As a result, the presiding judge ruled that no witnesses could testify to matters that occurred outside the screening room, because no video of those events had been preserved. (Def. Ex. F). The jury entered not guilty verdicts as to the charges

against Pellegrino on March 28, 2008. (Third Amended Complaint, Doc. No. 34 at 24 n. 73; Def. Mot. at 7). The present civil action was commenced before this Court on November 18, 2009. (Doc. No. 1).

## II.        STANDARD OF REVIEW

In deciding a motion for summary judgment under Rule 56(c), a court must determine "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." Medical Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (internal citation omitted).

In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. Troy Chemical Corp. v. Teamsters Union Local No. 408, 37 F.3d 123, 125-26 (3d Cir. 1994); Oritani Savings & Loan Assn. v. Fidelity & Deposit Co. of Md., 989 F.2d 635, 638 (3d Cir. 1993).  An issue of material fact is said to be genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex Corp. v. Catrett, 477 U.S. 317, 322-32 (1986), the Supreme Court held that Rule 56(e) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions

on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed.R.Civ.P. 56(e)). This does not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Id. Rather, Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the required showing that a genuine issue of material fact exists. Id.; see also Morgan v. Havir Mfg. Co., 887 F. Supp. 759 (E.D. Pa. 1994); McGrath v. City of Phila., 864 F. Supp. 466, 472-73 (E.D. Pa. 1994).

**III.    ANALYSIS**

Pellegrino brings claims against the United States for property damage, false arrest and false imprisonment, malicious prosecution, and civil conspiracy under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b). She also brings claims against Defendants Abdul-Malik and Labbee in their individual capacities for retaliatory prosecution under the First Amendment, malicious prosecution under the Fourth Amendment, as well as conspiracy to engage in malicious prosecution. The Court analyzes each of these in turn below.

**A.   FEDERAL TORT CLAIMS ACT (FTCA)**

**1.   Section 2680(h)'s law enforcement proviso**

The FTCA partially abrogates the sovereign immunity of the United States and provides an avenue for tort claims for the wrongful conduct of federal employees. See 28 U.S.C. § 2671 *et seq*. Under § 2680(h) of the Act, which is at issue here, the United States generally preserves its immunity for charges of assault, battery, false imprisonment, false arrest, abuse of process and malicious prosecution. <u>See</u> 28 U.S.C. § 2680(h). However, the U.S. has waived its sovereign immunity in instances when these claims are brought against "investigative or law enforcement officers of the United States Government." <u>Id</u>. An investigative or law enforcement officer is defined in the statute as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." <u>Id</u>. Defendants maintain, as they did at the motion to dismiss stage, that TSA employees like Abdul-Malik and Labbee do not fall within this "law enforcement proviso" to § 2680(h), and their conduct is immunized from suit.

The Court will begin its analysis with the language of the statute - if the statute's meaning is unambiguous, the Court need not inquire further. <u>In re Phila Newspapers, LLC</u>, 599 F.3d 298, 304 (3d Cir. 2010); <u>Connecticut Nat'l Bank v. Germain</u>, 503 U.S. 249, 254 (1992). As the Supreme Court has noted regarding the

FTCA, "[a] word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." Dolan v. U.S. Postal Service, 546 U.S. 481, 492 (2006). When interpreting an exception to the FTCA, "the proper objective of a court . . . is to identify those circumstances which are within the words and reason of the exception - no less and no more." Id. Moreover, the general rule that "a waiver of the Government's sovereign immunity will be strictly construed" is not applicable in the FTCA context. Id. at 491-92.

First, the Court considers whether TSOs are "empowered by law to execute searches. . . for violations of Federal law." The Court finds the phrase "searches . . . for violations of Federal law" to be ambiguous in the statute. If Congress intended "search" in § 2680(h) to be synonymous with "search" within the meaning of the Fourth Amendment, then TSA screeners are undoubtedly "empowered by law to execute searches," because it is well-established that airport screenings are Fourth Amendment searches, justified under the administrative exception to the warrant requirement. U.S. v. Hartwell, 436 F.3d 174, 178 (3d Cir. 2006). The District Court for the District of Arizona recently articulated just that - because "airport screenings are searches"

11

within the meaning of the 4th Amendment, and TSA agents are authorized to conduct screenings, "there is no question that TSA agents are 'empowered by law to execute searches.'" Armato v. United States, No. 11-2462, Order of May 15, 2012, at 5 (D. Ariz. 2012).[2]

However, if Congress intended the "searches . . . for violations of Federal law" executed by "investigative or law enforcement officers" not to be coextensive with all searches under the Fourth Amendment, then TSA screeners may not fall within the law enforcement proviso. Such a view was espoused in Walcott v. United States, in which the District Court for the Eastern District of New York concluded that "the meaning of 'empowered by law to execute searches . . . for violations of Federal law' under § 2680(h) is narrower than the meaning of a 'search' under the Fourth Amendment - that is, just because something is an administrative search under the Fourth Amendment, it doesn't mean the person doing the search is a law enforcement officer under § 2680(h)." Walcott v. United States, No. 13-3303, 2013 WL 5708044 at *3 (E.D.N.Y. Oct. 18, 2013).

The relevant statutory scheme sheds little light on how broadly "search" is to be defined. Defendants point out that the TSA Administrator has the authority to designate TSA employees or

---

[2] Certainly, TSOs are authorized to "execute searches" in the colloquial sense of the term. For example, TSO Kissinger describes her duties as "physical bag searches, working the x-ray, and searching passengers." Kissinger Dep. at 24.

employees of other federal agencies to serve as law enforcement officers. 49 U.S.C. § 114(p). By internal TSA Management Directive, this law enforcement authority has not been delegated to TSOs.[3] See TSA Management Directive No. 1100.88-1, Transportation Security Administration, (Def. at Ex. H). Though these provisions demonstrate that TSOs have not been delegated any general law enforcement authority, it does not answer whether they have been authorized by law to conduct searches, and what is meant by the term "search."

In a different statutory provision, the TSA Administrator has delegated to TSOs the much more narrow authority to conduct screenings. See 49 U.S.C. § 44901 (a) ("[t]he Under Secretary of Transportation for Security shall provide for the screening of all passengers and property"); see also Armato, No. 11-2462, Order of May 15, 2012 at 5. A "screening," in turn, is defined as "a physical examination or non-intrusive methods of assessing whether cargo poses a threat to transportation security. Methods of screening include x-ray systems, explosives detection systems, explosives trace detection, explosives detection canine teams certified by the Transportation Security Administration, *or a physical search* together with manifest verification." 49 U.S.C. § 44901(g)(5)(emphasis added). This provision, however, simply

---

[3] In contrast, it has been delegated to Criminal Investigators, Federal Air Marshals, and Transportation Security Specialists.

brings the Court back to its initial question: is the meaning of "search" within 28 U.S.C. § 2680(h), and also 49 U.S.C. § 44901(g)(5), meant to encompass all Fourth Amendment administrative searches? Because the answer does not present itself in a plain reading of § 2680(h) or its related provisions, the Court next examines the legislative history.

The legislative history indicates that Congress intended the law enforcement proviso to waive sovereign immunity in a circumscribed context having to do with wrongdoing by law enforcement officials investigating criminal activity. In <u>Solomon v. U.S.</u>, the Fifth Circuit provided an overview of the legislative intent behind § 2680(h):

> A review of the legislative history reveals that Congress, in response to "no-knock" raids conducted by federal narcotic agents on the wrong dwellings, passed the 1974 amendment to the Federal Tort Claims Act to provide compensation for such victims. S. Rep. No. 588, 93rd Cong., 2d Sess., reprinted in (1974) U.S. Code Cong. & Admin. News, pp. 2789, 2790-91. Congress intended to waive sovereign immunity for the torts of false arrest and false imprisonment only in limited circumstances.

<u>Solomon v. U.S.</u>, 559 F.2d 309, 310 (5th Cir. 1977)(holding that security employees of military exchange were not "investigative or law enforcement officers"). The Fourth Circuit's reading of the relevant legislative history is similar. In <u>Norton v. U.S.</u>, the Fourth Circuit concluded that the legislative history

> [S]hows a concern with providing an effective remedy 'for innocent victims of Federal law enforcement Abuses.'" S.Rep. 93-588, 93rd Cong., 2d Sess., Reprinted in (1974) U.S. Code Cong. & Admin. News at 2792. It must be remembered that Congress passed this legislation in the wake of the Collinsville drug raids where government officials had engaged in what may fairly be described as outrageous behavior . . . It was, we think, to remedy these more egregious wrongs that Congress waived sovereign immunity.

Norton v. U.S., 581 F.2d 390, 396 (4th Cir. 1978). The analysis of the legislative history by the Fifth and Fourth Circuits strongly suggests that the law enforcement proviso was enacted as a response to specific eggregious behavior during raids conducted by federal law enforcement officers, and was not intended to be expansive enough to cover airport security screeners. See also Caban v. U.S., 671 F.2d 1230, 1234 (2d Cir. 1982)(§ 2680(h) "was triggered by the abusive tactics of federal narcotics agents who engaged in illegal, unconstitutional 'no-knock' raids."); Art Metal-U.S.A., Inc. v. U.S., 577 F. Supp. 182, 185 (D.D.C. 1983)("The legislative history of the amendment indicates that Congress was concerned with . . . warrantless searches in violation of the federal 'no-knock' statute.").

The conclusion that TSA employees who conduct airport screenings do not fall within the law enforcement proviso is in accord with the large majority of district courts recently confronted with this issue, though the reasoning of these courts has varied. See Hernandez v. United States, No. 12-cv-03165, 2014

WL 803774 (D. Colo. 2014); <u>Walcott v. United States</u>, 2013 WL 5708044 at *2-3 (E.D.N.Y. 2013)("TSA screeners do check passengers and their bags for items, such as explosives, that are simply contraband under federal law. But screeners are primarily looking for items . . . [which are] not illegal to possess. If a screener does find something that is simply illegal to possess . . . the screener is not authorized to arrest the person."); <u>Weinraub v. United States</u>, 927 F.Supp.2d 258, 266 (E.D.N.C. 2012)("the limited, consensual searches conducted by TSA screeners do not bring them within the definition of 'investigative or law enforcement officers'");[4] <u>Lewis v. Napolitano</u>, CIV.A. 11-2137, 2012 WL 274415 (E.D. La. Jan. 31, 2012); <u>Corbett v. Transp. Sec. Admin.</u>, 12-20863-CV, 2012 WL 8963931 (S.D. Fla. Nov. 16, 2012); <u>Coulter v. United States Dep't of Homeland Sec.</u>, 2008 U.S. Dist. LEXIS 72014 (D.N.J. Sept. 23, 2008); <u>Welch v. Huntleigh USA Corp.</u>, 04-663, 2005 WL 1864296 (D. Or. Aug. 4, 2005)("[s]creeners do not have the authority to detain individuals and must call law enforcement officers to search, seize, and arrest individuals if illegal items are

---

[4]     The <u>Armato</u> court responds, however, that airport screenings are not in fact dependent on passenger consent. <u>Armato</u>, No. 11-2462, Order of May 15, 2012, at 6 (D. Ariz. 2012)(citing <u>United States v. Aukai</u>, 497 F.3d 955, 960 (9th Cir. 2007)), and that in any case the purported nature of consent is immaterial, because "airport screening searches" are mandated by federal law, and thus screeners who perform those screening searches are authorized to do so by law. <u>Id</u>. at 5 n. 4. The Third Circuit recently cited approvingly to the Ninth Circuit's holding in <u>Aukai</u> that the constitutionality of an airport screening search does not depend on a passenger's purported consent. <u>George v. Rehiel</u>, 738 F.3d 562, 576 (3d Cir. 2013).

found.") Some further support for this position can be found in
Matsko v. United States, in which the Third Circuit concluded
that a Mine Safety and Health Administration inspector was not an
investigative or law enforcement officer because "employees of
administrative agencies, no matter what investigative conduct
they are involved in, do not come within the § 2680(h)
exception." Matsko, 372 F.3d 556, 560 (3d Cir. 2004). Guided by
the legislative history of the provision, the Third Circuit's
implication in Matsko, as well as the reasoning of other district
courts, the Court holds that TSOs Abdul-Malik and Labbee are not
"investigative or law enforcement officers" under 28 U.S.C.
§ 2680(h).

Because TSA screeners are not encompassed in the law
enforcement proviso of § 2680(h), the waiver of sovereign
immunity in the FTCA does not apply to Pellegrino's false arrest,
false imprisonment, malicious prosecution, and related civil
conspiracy claims. This Court is thus without jurisdiction to
entertain those claims, and dismisses them accordingly.

However, while § 2680(h) precludes liability of the United
States for "any claim arising out of" certain intentional torts,
property damage is not therein enumerated. See 28 U.S.C.
§ 2680(h). Defendants argue that the property damage "arises
from" underlying intentional torts in this action, and is thus
also barred by the application of § 2680(h). (Def. Mot. at 11

17

n.3). The Court disagrees. That Defendant Abdul-Malik caused
damage to Plaintiff's property is a stand-alone claim, and has
not been framed in relation to the false arrest and false
imprisonment that have also been alleged. The property damage
claim stems from certain actions taken by Abdul-Malik during the
screening of Plaintiff's property, and the false imprisonment and
malicious prosecution claims stem from different, separate
activity that TSOs allegedly took after the search was complete.
Thus, Plaintiff's property damage claim under the FTCA as against
Defendant United States may proceed.

### 2.   FTCA Judgment Bar

28 U.S.C. § 2676 provides that a "judgment" issued in an
FTCA claim "shall constitute a complete bar to any action by the
claimant, by reason of the same subject matter, against the
employee of the government whose act or omission gave rise to the
claim." 28 U.S.C. § 2676. The United States argues that the
judgment bar in § 2676 forecloses Pellegrino's <u>Bivens</u> claims
under the First and Fourth Amendments because the FTCA claims of
the same subject matter are barred by § 2680(h). The Court does
not agree.

While it is true that the same actions, occurrences, and
government employees are at issue in Pellegrino's FTCA and <u>Bivens</u>
claims, the Court's determination that it lacks jurisdiction over
the FTCA claims is not a "judgment" for the purposes of the

judgment bar.

Some courts - though not the Third Circuit - have held that a judgment on FTCA claims extinguishes <u>Bivens</u> claims brought in the same lawsuit. <u>See</u>, <u>e.g.</u>, <u>Manning v. United States</u>, 546 F.3d 430 (7th Cir. 2008); <u>Harris v. United States</u>, 422 F.3d 322 (6th Cir. 2005); <u>Estate of Trentadue ex rel. Aguilar v. United States</u>, 397 F.3d 840 (10th Cir. 2005). Those courts have reasoned that "where plaintiffs bring a <u>Bivens</u> action against federal employees relating to the same underlying conduct at issue in an FTCA claim, they risk having a judgment on the FTCA claims operate to bar their Bivens theories." <u>Abhouran v. Morrison</u>, CIV. A. 07-5513, 2011 WL 1004038 at *6 (E.D. Pa. Mar. 19, 2011)(citing <u>Unus v. Kane</u>, 565 F.3d 103, 122 (4th Cir. 2009)).

However, the present circumstances warrant a holding that Plaintiff's <u>Bivens</u> claims are not precluded. Here, the Court determined that it lacks jurisdiction over Plaintiff's FTCA claims; it has not entered *judgment* that Plaintiff has failed to adduce sufficient evidence to present those claims at trial or entered *judgment* following a jury verdict. Indeed, subject-matter jurisdiction is an element without which a court is powerless to proceed, and without which it is unable to enter a judgment on the merits. 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure (Civil 3d) § 3713 (1998) at pp. 238-39 & n. 49 ("[i]f the court has no jurisdiction, it has no power to enter a

judgment on the merits and must dismiss the action"). In this situation, the Court is guided by the reasoning of the Second Circuit in Hallock v. Bonner:[5]

> [A]n action brought under the FTCA and dismissed for lack of subject matter jurisdiction because it falls within an exception to the restricted waiver of sovereign immunity provided by the FTCA does not result in a "judgment" . . . This is so because the action was not *properly* brought *under* the Federal Tort Claims Act in the first place and is a nullity. We hold that for the judgment bar to apply, the action must first be a proper one for consideration under the Federal Tort Claims Act. In other words, it must fit within the category of cases for which sovereign immunity has been waived.

Hallock v. Bonner, 387 F.3d 147, 155 (2d Cir. 2004)(emphasis in original) rev'd on other grounds sub nom. Will v. Hannock, 546 U.S. 345 (2006). The intent behind the judgment bar supports this reasoning. As the Supreme Court has explained, "[t]he concern behind [the statutory judgment bar] is . . . of avoiding duplicative litigation, multiple suits on identical entitlements

---

[5] In Hallock v. Bonner, plaintiffs brought an action against the United States under the FTCA, which was dismissed on the basis of an exception to the FTCA under §2680(e). Hallock v. United States, 253 F.Supp.2d 361 (N.D.N.Y. 2003). While the action was still pending, plaintiffs brought a Bivens action, which was not dismissed because the Court found that judgment bar was not applicable as the previous case had been dismissed on procedural grounds. Hallock v. Bonner, 281 F.Supp.2d 425 (N.D.N.Y. 2003). The Court of Appeals for the Second Circuit affirmed. Hallock v. Bonner, 387 F.3d 147 (2d Cir. 2004). The Supreme Court granted certiorari to consider the judgment bar, yet vacated the decision of the Second Circuit for want of appellate jurisdiction without addressing the judgment bar issue. Will v. Hallock, 546 U.S. 345, 349 (2006). On remand, the district Court granted summary judgment to defendants without addressing the judgment bar issue, Hallock v. Bonner, 567 F.Supp.2d 334 (N.D.N.Y. 2008), and the Second Circuit again affirmed. Hallock v. Bonner, 343 Fed. Appx. 633 (2d Cir. 2009).

or obligations between the same parties." <u>Will v. Hallock</u>, 546
U.S. 345, 354 (2006). Our colleague Judge Yohn has likewise
written that "Congress had two purposes in mind when it enacted
the judgment bar - Congress sought to prevent plaintiff from
obtaining dual recoveries and sought to prevent the government
from bearing the burden of defending multiple lawsuits." <u>Kreider
v. Breault,</u> 2012 WL 3518470 at *7 (E.D. Pa. 2012)(citing <u>Gasho v.
United States</u>, 39 F.3d 1420, 1437 (9th Cir. 1994)); <u>see also</u>
<u>Michalik v. Hermann</u>, 2002 WL 31844910 at *2 (E.D. La.
2002)(dismissal of FTCA claim on procedural grounds does not
trigger judgment bar); James E. Pfander & Neil Aggarwal, <u>Bivens,</u>
<u>The Judgment Bar, and the Perils of Dynamic Textualism</u>, 8 U. St.
Thomas L.J. 417, 418 (2011)("The idea [of the judgment bar] was
straightforward: once a tort plaintiff has pursued a vicarious
liability claim against the federal government to judgment,
whether successfully or unsuccessfully, the judgment bar would
block a later negligence suit against the federal employee for
the same act or omission.")

In this case, there is no possibility of duplicative
litigation given the Court's lack of jurisdiction over the FTCA
claims, nor is there any possibility of dual recovery by
Pellegrino. Indeed, denying Plaintiff her day in court regarding
her constitutional claims as a result of lack of jurisdiction
over her state-law tort claims would be an absurd result. <u>See</u>,
<u>e.g.</u>, <u>Kreider</u>, 2012 WL 3518470 at *8 (declining to bar plaintiff

from proving excessive force under <u>Bivens</u> due to her inability to prove IIED under the FTCA so as to avoid "an unduly harsh result here that is, quite frankly, absurd."); <u>Van Beek v. Robinson</u>, 11-10514, 2013 WL 2446121 at *4 (E.D. Mich. June 5, 2013)(granting plaintiff's motion to dismiss FTCA claims without prejudice to avoid "absurd result" that dismissal with prejudice would implicate judgment bar); <u>Donahue v. Connolly</u>, 890 F. Supp. 2d 173, 187 (D. Mass. 2012)("[b]arring <u>Bivens</u> claims based on an untimely barred FTCA claim does seem patently absurd.")

Though cognizant of the fact that it stands against decisions made by courts in other circuits,[6] the Court holds that its dismissal of Plaintiff's FTCA claims for lack of jurisdiction does not require dismissal under 28 U.S.C. § 2676 of Plaintiff's <u>Bivens</u> claims.

## B.    THE BIVENS REMEDY FOR RETALIATORY / MALICIOUS PROSECUTION UNDER THE FIRST AND FOURTH AMENDMENTS

Defendants argue that the Court should not "extend" the <u>Bivens</u> remedy to the unique context of this case. However, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out . . . [w]hen the vengeful officer is federal, he is

---

[6] A few circuit courts have held that dismissal of FTCA claims, even if not on the merits, requires application of the judgment bar. <u>Farmer v. Perrill</u>, 275 F.3d 958, 964-65 (10th Cir. 2001)(failure to prosecute); <u>Hoosier v. Bancorp</u>, 90 F.3d 180, 184-85 (7th Cir. 1996)(statute of limitations); <u>Gasho v. United States</u>, 39 F.3d 1420, 1436-38 (9th Cir. 1994)(abuse of process). The Third Circuit is not among them.

subject to an action for damages on the authority of <u>Bivens</u>."
<u>Hartman v. Moore</u>, 547 U.S. 250, 256 (2006). While the Supreme
Court has thus far declined to recognize a First Amendment <u>Bivens</u>
claim in the context of free speech or free exercise claims,
<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675 (2009); <u>Bush v. Lucas</u>, 462
U.S. 367, 368 (1983), the Supreme Court in <u>Hartman</u> explicitly
recognized the type of claim that Pellegrino brings, and other
courts have allowed to proceed: a claim of retaliation for
protected speech. <u>See</u>, <u>e.g.</u>, <u>Tobey v. Jones</u>, 706 F.3d 379, 386
(4th Cir. 2013)(passenger stated First Amendment <u>Bivens</u>
retaliation claim against TSA officials). The Court will not
dismiss Plaintiff's First Amendment claim on this ground.

As to Plaintiff's Fourth Amendment claim, while the Supreme
Court has never explicitly recognized that the Fourth Amendment
encompasses a malicious prosecution claim, the Courts of Appeal
have overwhelmingly done so. <u>See</u>, <u>e.g.</u>, <u>Hernandez-Cuevas v.
Taylor</u>, 723 F.3d 91, 94 (1st Cir. 2013); <u>Evans v. Chalmers</u>, 703
F.3d 636, 647 (4th Cir. 2012); <u>Grider v. City of Auburn</u>, 618 F.3d
1240, 1256 (11th Cir. 2010); <u>Manganiello v. City of New York</u>, 612
F.3d 149, 160-61 (2d Cir. 2010); <u>McKenna v. City of Philadelphia</u>,
582 F.3d 447, 461 (3d Cir. 2009). In doing so, some have relied
on the dicta in <u>Albright v. Oliver</u>, 510 U.S. 266, 266 (1994), in
which the Supreme Court acknowledged that "the Court has noted
[the Fourth] Amendment's relevance to the liberty deprivations
that go hand in hand with criminal prosecutions." <u>Id</u>. The Court

now follows existing appellate jurisprudence in recognizing Plaintiff's malicious prosecution claim under the Fourth Amendment.

## C.   SPECIAL FACTORS

Even if a plaintiff alleges a violation of a Constitutional right, Bivens remedies are context-specific and their reach does not automatically extend into all contexts and against all defendants. More specifically, if there exists an alternative mechanism providing for an effective substitute to a Bivens claim, Wilkie v. Robbins, 551 U.S. 537, 550 (2007), or "special factors counseling hesitation in the absence of affirmative action by Congress," Bush v. Lucas, 462 U.S. 367, 377 (1983), a Bivens right of action should not be inferred. The Court will address these in turn.

### 1.   Alternative Mechanisms and Remedies

"In the first place, there is the question whether any alternative existing process for protecting [Plaintiff's] interest amounts to a convincing reason" not to imply a Bivens remedy in this context. Wilkie, 551 U.S. at 537. In the present case, the alternative mechanisms that Defendants argue constitute an equally effective substitute for Pellegrino's Bivens claims are (1) the criminal proceeding in which she was prosecuted, (2) Pennsylvania state tort law, (3) 42 U.S.C. § 1983, and (4) the TSA's Contact Center. Additionally, the United States

24

argues that the absence of a damages remedy in the statutory
scheme created by Congress to govern transportation security in
the aftermath of September 11, 2001, cannot be considered
inadvertent. Moreover, Congress continues to consider adding new
entitlements for passengers to this scheme.

The Court finds that these alternative mechanisms are
insufficient to supplant the Plaintiff's recognized <u>Bivens</u>
remedies under the First and Fourth Amendments. In <u>Wilkie v.
Robbins</u>, a landowner sued the Bureau of Land Management for a
course of "harassment and intimidation" in attempts to obtain an
easement across his property. 551 U.S. at 568 (Ginsburg, J.,
concurring). The Supreme Court considered the remedies available
to the plaintiff, including a tort remedy for trespass, an
administrative process with the Interior Board of Land Appeals
and judicial review under the Administrative Procedure Act, and
the right to jury trial and recoupment of attorneys' fees on the
criminal complaints against him. <u>Id</u>. at 551-54. The Court noted
that a state law remedy may have been unavailable to the
plaintiff against federal officials, but also that the plaintiff
took no appeal from a number of administrative decisions subject
to judicial review. <u>Id</u>. at 552. Faced with this "patchwork . . .
assemblage of state and federal, administrative and judicial
benches applying regulations, statutes, and common law rules,"
the Supreme Court concluded that the remedies neither pointed
affirmatively to the necessity of a <u>Bivens</u> remedy or counseled

25

against one. Id. at 554.

The remedies available to Pellegrino provide much thinner cover than those available to the plaintiff in Wilkie. Defendants agree that Pellegrino's state-law claims would be foreclosed by § 2680(h); moreover, the FTCA and Bivens are meant to be complementary remedies, and the former does not foreclose the latter. Carlson, 446 U.S. at 18-23. 42 U.S.C. § 1983 may give Pellegrino an avenue against state police officers involved in her arrest, but would not vindicate her malicious prosecution claim given that she alleges the prosecution was induced by federal officials. The TSA's Contact Center may be an effective register of complaints, but Defendants provide no details on whether it offers any possibility of remedy to complainants. As for the criminal proceeding, like in Wilkie, "the rapid acquittal tended to support [plaintiff's] charge of baseless action by the prosecution," id. at 552, and does not by itself provide an adequate alternative remedy.

The lack of an "elaborate, comprehensive scheme" providing remedies also weighs in favor of allowing a Bivens suit in this context. This case is not akin to one in which the Supreme Court has found a Congressional scheme to preclude Bivens claims. See Bush v. Lucas, 462 U.S. 367 (1983)(detailed Civil Service Commission regulations provided substantive and procedural remedies for improper federal personnel actions); Schweiker v. Chilicky, 487 U.S. 412 (1988)(Social Security Act addressed

problems created by wrongful termination of disability benefits);
Correctional Services Corp. v. Malesko, 534 U.S. 61
(2001)(injunctive relief in federal court and formal review in
Bureau of Prison's Administrative Remedy Program provided formal
review of inmate's grievances). Defendants have not shown how the
present circumstances are like those in Lucas, Chilicky, or
Malesko, nor how there otherwise exists a comprehensive scheme or
remedy program to address Pellegrino's claims.

Defendants also aver that "[i]n light of Congress's careful
attention to the problem of transportation security in the
aftermath of the attacks of September 11, 2001, it can hardly be
said that the absence of a constitutional damages remedy in this
context is inadvertent." (Def. Mot. at 31-32).

In Schweiker, the Supreme Court counseled for "appropriate
judicial deference . . . [w]hen the design of a Government
program suggests that Congress has provided what it considers
adequate remedial mechanisms for constitutional violations that
may occur," even if those mechanisms do not provide complete
relief. Schweicker, 487 U.S. at 423. Here, Defendants spend
little time explaining why "the statutory scheme surrounding the
creation of the TSA" (Def. Mot. at 31) implies that Congress has
intentionally withheld a remedy.[7] Defendants do point to

---

[7] Defendants make a passing reference to 49 U.S.C. § 44926(a), which
establishes a remedial mechanism for individuals prohibited from boarding
aircraft because they were wrongly identified as a threat. Id. Without further
explanation, the Court is not persuaded that the existence of this provision

Congressional intent of remedial mechanisms in the form of
proposals that have not yet been passed or signed into law.
Whether those proposals, if enacted, will provide for adequate
remedial mechanisms in the future - or whether their legislative
history will suggest an intentional lack of action by Congress -
cannot inform the Court's present analysis. See Garcia v. Texas,
131 S.Ct. 2866, 2868 (declining to stay execution based in part
on "the bare introduction of a bill in a single house of
Congress.") The alternative mechanisms available to Pellegrino,
and the statutory scheme at issue, do not preclude her Bivens
remedy.

### 2.   Special Security Concerns

Even in the absence of an alternative remedy, a "Bivens
remedy is a subject of judgment," Wilkie, 551 U.S. at 550, in
which courts must take into account "any special factors
counseling hesitation before authorizing a new kind of federal
litigation." Id. (citing Bush, 462 U.S. at 378). The United
States argues that "[t]he interplay of the limited powers of TSA
screeners, their relationship to law enforcement officers at the
airport, and our nation's security all counsel hesitation against
authorizing a new Bivens remedy" in the present case. (Def. Mot.
at 34). In particular, Defendants emphasize, because TSA
screeners must coordinate with local law enforcement when

---

proves Congress's intent to withhold a remedy against TSA employees in their
individual capacities for claims such as retaliatory prosecution.

presented with criminal conduct, subjecting them to possible civil suits would dissuade them from performing their duties properly. Given the TSOs' critical role in securing the nation's airports, the exposure to liability "could potentially lead to catastrophe" (Def. Mot. at 38) if a TSO declined to cooperate with an arresting officer for fear of personal liability.

Deterrence of federal officials from committing constitutional violations is integral to the existence of Bivens actions. See Butz v. Economou, 438 U.S. 478, 505 (1978). In order to balance the deterrent effect of litigation with "the danger that the threat of such liability would deter [a public officer]'s willingness to execute his office with the decisiveness and judgment required by the public good," id. at 497, courts have developed the doctrine of qualified immunity. In Harlow v. Fitzgerald, the Supreme Court considered the "great[] responsibilities, both to the President and to the Nation" entrusted to Presidential aides, yet rejected their claimed entitlement to absolute immunity. Harlow v. Fitzgerald, 457 U.S. 800, 809 (1982). Similarly to the work of the aides in Harlow, the critical nature of the work performed by TSOs does not persuade the Court to wholly preclude Bivens liability against them.

It is true that cases implicating national security concerns have traditionally evoked judicial caution, see, e.g., Arar v. Ashcroft, 585 F.3d 559 (2d Cir. 2009), and "there can be no doubt

that preventing terrorist attacks on airplanes is of paramount importance," U.S. v. Hartwell, 436 F.3d 174, 179 (3d Cir. 2006). Yet the right of a person being screened at an airport to be free of retaliatory actions for speaking out is not diminished by the heightened security interest at airport checkpoints. See Tobey v. Jones, 706 F.3d 379, 393 (4th Cir. 2013)("While the sensitive nature of airport security weighs heavily on the Court . . . [we are] unwilling to relinquish our First Amendment protections - even in an airport."). In fact, a TSO incurs no risk of a suit for malicious prosecution if the TSO has probable cause to believe that a criminal violation has been committed, and should not hesitate to coordinate with law enforcement in cases where probable cause exists.

Moreover, the questions presented by this specific case do not require the type of judicial intrusion into foreign or national security policy typically unsuitable for scrutiny by judicial branches. Cf. Ashcroft, 585 F.3d at 574 (international rendition); Lebron v. Rumsfeld, 670 F.3d 540 (4th Cir. 2012)(policy judgments regarding designation and treatment of enemy combatants); Doe v. Rumsfeld, 683 F.3d 390 (D.D.C. 2012)(designation of detainees and policies governing interrogation techniques). Instead, the present circumstances encompass exactly the type of facts and issues comfortably within the judiciary's purview - retaliatory action, probable cause, causation, and damages.

**D.    FACTUAL ISSUES**

Defendants next argue that Plaintiff lacks sufficient evidence to sustain her constitutional claims with respect to the elements of probable cause, malice, agreement, deprivation of freedom under the Fourth Amendment, and protected conduct under the First Amendment.

**1.    Probable Cause**

To prevail on both her First Amendment retaliatory prosecution and Fourth Amendment malicious prosecution claims, Pellegrino must show that the Defendants initiated criminal proceedings against her that were not supported by probable cause. Hartman v. Moore, 547 U.S. at 562; Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007). As the Supreme Court explained in Hartman, the causation that a Bivens plaintiff like Pellegrino must prove is that "the nonprosecuting official acted in retaliation, and must also show that [the official] induced the prosecutor to bring charges that would not have been initiated without his urging." Hartman, 547 U.S. at 262. To bridge "the gap between the nonprosecuting government agent's motive and the prosecutor's action," evidence of a lack of probable cause is necessary to address the longstanding presumption of prosecutorial regularity. Id. at 263. Thus, "to prevail on a malicious prosecution claim, the plaintiff must show that the officers lacked probable cause to arrest her." Johnson, 477 F.3d

31

at 82 (citing <u>Wright v. City of Philadelphia</u>, 409 F.3d 595, 604
(3d Cir. 2005)); <u>see also</u> <u>George v. Rehiel</u>, 738 F.3d 562, 583
(3d. Cir. 2013)("absent something on the record to the contrary,
it seems just as likely that police officers who are summoned by
TSA Officials would use their own independent discretion to
determine whether there are sufficient grounds to take someone
into custody.")

Probable cause is comprised of the "facts and circumstances
within the officer's knowledge that are sufficient to warrant a
prudent person, or one of reasonable caution, in believing, in
the circumstances shown, that the suspect has committed, is
committing, or is about to commit an offense." <u>Michigan v.</u>
<u>DeFillippo</u>, 443 U.S. 31, 37 (1979). The central inquiry is
whether the totality of the circumstances "were sufficient to
justify a reasonable belief that an offense was being committed."
<u>Johnson v. Campbell</u>, 332 F.3d at 211 (citing <u>United States v.</u>
<u>Glasser</u>, 750 F.2d 1197, 1206 (3d Cir. 1984)). "Thus, it is not
material to the probable cause inquiry whether the [plaintiff]
actually committed the offense." Favata v. Seidel, 511 Fed. Appx.
155, 159 (3d Cir. 2013). Instead, the inquiry is objective and
based on the facts available to the officer at the time he made
the arrest. Id.

When defendants initiate criminal proceedings on multiple
charges, courts must separately scrutinize the probable cause
underlying each charge alleged to have been maliciously

32

prosecuted. Johnson v. Knorr, 477 F.3d at 85 (quoting Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991)). The question of probable cause is typically one for the jury, especially where the determination rests on credibility conflicts. Merkle v. Upper Dublin School Dist., 211 F.3d 782, 788 (3d Cir. 2000). However, a district court may conclude that probable cause exists as a matter of law if the evidence would not support a contrary factual finding. Id. (quoting Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997)).

Defendants aver that Plaintiffs put forth no evidence to show a lack of probable cause for Pellegrino's prosecution. They argue that probable cause exists in the form of statements by Defendants Abdul-Malik and Labbee, as corroborated by Kissinger. This Court previously found that "the Complaint before us raises a question as to whether the police officers and prosecutors involved in this case had reasonably trustworthy information of the sort that would warrant a prudent person concluding that the suspect committed the charged offense." (Memorandum and Opinion, Doc. No. 77 at 28-29). Now facing the higher hurdle of summary judgment, Pellegrino must put forth sufficient evidence from which a reasonable juror could find that Abdul-Malik and Labbee's statements to the police were not credible accounts from reliable witnesses, such that the officer's belief that an offense had been committed was not justified.

The Court finds that a prudent officer could have reasonably

inferred that Pellegrino had committed felony aggravated assault,[8]
possessing instruments of a crime, simple assault, or recklessly
endangering another person. The evidence before the Court
regarding the information available to arresting officers and
subsequently prosecutors are Philadelphia Police Department
Incident Reports and Arrest Reports detailing the July 29, 2006
incident, as well as Kissinger and Abdul-Malik's testimony
describing their interactions with the police. See (Doc. No.
173); Def. Ex. C. The Incident Reports filled out by the police
officer who arrested Pellegrino indicate that he interviewed
Abdul-Malik and Labbee. See (Doc. No. 173). Both of the TSOs
reported that Pellegrino had become unruly and that she had
struck the TSOs in the leg and stomach, respectively, with her
bag. See id. They reported suffering a stomach bruise and leg
pain as a result. See id. Looking at the evidence most favorably
to Pellegrino,[9] a jury could not conclude that a prudent person in
the officer's place would not have been justified in believing,

---

[8] These offenses are defined in part as follows: aggravated assault, 18
Pa. C.S.A. § 2702 ("attempts to cause serious bodily injury to another, or
causes such injury intentionally, knowingly or recklessly under circumstances
manifesting extreme indifference to the value of human life" or "attempts to
cause or . . . causes bodily injury to . . . A Federal law enforcement
official); possessing instruments of a crime, 18 Pa. C.S.A. § 907 ("possesses
any instrument of crime with intent to employ it criminally"); simple assault,
18 Pa. C.S.A. § 2701 ("attempts to cause or intentionally, knowingly, or
recklessly causes bodily injury to another"), and reckless endangerment, 18
Pa. C.S.A. § 2705 ("recklessly engages in conduct which places or may place
another person in danger of death or serious bodily injury").

[9]   The fact that the officer may not have questioned Pellegrino before
arresting her is inapposite, because a police officer need not interview all
available witnesses to have probable cause to arrest. Merkle, 211 F.3d at 790
n. 8.

on the basis of these statements, that Pellegrino had committed these crimes of assault.

However, the Court finds that Pellegrino has adduced sufficient evidence to show lack of probable cause as to one of the charges against her, that of making terroristic threats.[10] The Incident Reports contain no information about any threats made by Pellegrino, or in fact any words spoken by her at all. See (Doc. No. 173). Nor do the Philadelphia Police Department Arrest Reports or TSO testimony contain any suggestion of a threat as defined by Pennsylvania statute. See id; see also 18 Pa. C.S.A. § 2706(a). Thus, a genuine issue of material fact exists as to whether probable cause existed for arresting and then prosecuting Pellegrino on the charge of making terroristic threats.

### 2.  **Malice**

Third Circuit precedent requires a plaintiff alleging malicious prosecution under the Fourth Amendment to prove that "the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice." Johnson, 477 F.3d at 81-82. The facts relevant to the analysis of probable cause are necessarily intertwined with those regarding malice, for an official that engineers a criminal prosecution lacking probable

---

[10] "A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to: (1) commit any crime of violence with intent to terrorize another; (2) cause evacuation of a building, place of assembly or facility of transportation; or (3) otherwise causing serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience." 18 Pa. C.S.A. § 2706(a).

cause is likely to have been impelled by malicious motivation.
Pellegrino testified that the behavior and language of Defendants
Labbee and Abdul-Malik indicated that they acted out of malice
toward her. A jury could well choose to believe her. The Court
finds that Pellegrino has produced sufficient evidence on this
issue to preclude summary judgment.

### 3.   Deprivation of Freedom under the Fourth Amendment

Pellegrino has shown that she suffered a deprivation of
freedom sufficient to sustain her Fourth Amendment malicious
prosecution claim. A plaintiff must prove that she "suffered
deprivation of liberty consistent with the concept of seizure as
a consequence of the legal proceeding." Johnson, 477 F.3d at 81-
82. An arrest that results in detention is a prototypical seizure
within the purview of the Fourth Amendment. Id. at 222-23.
Onerous pretrial restrictions, such as posting bail or submitting
to travel restrictions, may also amount to a sufficient
deprivation of liberty for a malicious prosecution claim. Gallo
v. City of Phila., 161 F.3d 217, 222-23 (3d Cir. 1998). While "a
defendant who is incarcerated pending trial suffers greater
deprivation than one released on bail . . . even the latter
defendant is seized." Id. at 233 (citing Albright v. Oliver, 510
U.S. 266, 278 (1994)(Ginsburg, J., concurring)). Here, Pellegrino
faced a criminal proceeding in Philadelphia Municipal Court. She
was handcuffed, arrested, charged with criminal violations, spent
18 hours in jail, and posted a bond of $400 to secure her

pretrial release. She then faced no travel restrictions or obligations to report to pretrial services before the criminal proceeding.

Following <u>Gallo</u>'s "broad approach in considering what constitutes a seizure," 161 F.3d at 223-24, the Court finds that Plaintiff has shown sufficient evidence of a deprivation of liberty consistent with the concept of seizure. In marked contrast to the individual in <u>Gallo</u>, Pellegrino was handcuffed and arrested, and spent 18 hours in jail, after criminal complaints were sworn out against her and she was charged with ten criminal violations. <u>Cf</u>. 161 F.3d at 222. She was not released on her own recognizance but was required to post bail, even if it was of a relatively minimal amount. In light of these factors, Plaintiff has produced sufficient evidence of a qualifying deprivation of liberty sufficient to survive summary judgment.

### 4.   Protected Conduct under the First Amendment

The speech for which Pellegrino was allegedly prosecuted constitutes protected speech under the First Amendment. "The First Amendment on the whole offers broad protection for speech, be it unpleasant, disputatious, or downright offensive . . . [o]n the specific subject of "profane" words, the Supreme Court has held that even those words alone, unaccompanied by any evidence of violent arousal, are not "fighting words" and are therefore protected speech." <u>Johnson v. Campbell</u>, 332 F.3d 199, 212 (3d

Cir. 2003)(citing <u>Cohen v. California</u>, 403 U.S. 15, 20 (1971)).
Applying the standard in <u>Johnson</u>, Pellegrino's statement that TSO
Abdul-Malik and Labbee were "behaving like bitches," though
profane, was protected speech. Defendants do not contend that it
constituted unprotected fighting words. Moreover, Pellegrino's
other statements - that she would report the TSOs to higher
authorities - clearly constituted protected speech.

### 5.   Agreement for Civil Conspiracy

Defendants argue that Pellegrino fails to state a claim of
civil conspiracy to engage in malicious prosecution by Defendants
Abdul-Malik and Labbee, because she lacks evidence of a formal
agreement between them. To allege civil conspiracy, the plaintiff
must aver "a combination of two or more persons to do a criminal
act, or to do an act by unlawful means or for an unlawful
purpose." <u>Beidleman v. Stroh Brewery Co.</u>, 182 F.3d 225, 235-6 (3d
Cir. 1999)(quoting <u>Ammlung v. City of Chester</u>, 494 F.2d 811, 814
(3d Cir. 1974)). A jury could believe Pellegrino's testimony that
she witnessed Abdul-Malik and Labbee agree in her presence that
Pellegrino had hit them, and that based upon their understanding,
Defendants swore out false criminal complaints against her. This
evidence is sufficient to survive summary judgment.

### E.   QUALIFIED IMMUNITY

Government officials are immune "from liability for civil
damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a

reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457
U.S. 800, 818 (1982). The determination of whether this standard
is met "must be undertaken in light of the specific acts of the
case, not as a broad general proposition." <u>Brosseau v. Haugen</u>,
543 U.S. 194, 198 (2004). The ultimate question is whether the
defendant "'had fair warning' that his conduct deprived his
victim of a constitutional right.'" <u>Hope v. Pelzer</u>, 536 U.S. 730,
739-40 (2002). In order to overcome the qualified immunity
defense of TSOs in this case, Plaintiff must show that the
conduct of each individual TSO, "[t]aken in the light most
favorable to the party asserting the injury," <u>Reedy v. Evanson</u>,
615 F.3d 197, 223-24 (3d Cir. 2010), (1) "violated a statutory or
constitutional right, and (2) that the right was 'clearly
established' at the time of the challenged conduct." <u>Ashcroft v.
Al-Kidd</u>, 131 S. Ct. 2074, 2085 (2011).

As set forth above and in the Court's Motion to Dismiss
Order (Doc. No. 77), the Court is satisfied that Pellegrino has
set forth a plausible claim that her First and Fourth Amendment
rights were violated by Defendants. The Court holds, too, that
the right to be free from prosecution for a malicious/retaliatory
motive is one that is clearly established. <u>See</u> <u>Hartman v. Moore</u>,
547 U.S. at 256; <u>see</u> <u>also</u> <u>Johnson v. Campbell</u>, 332 F.3d at 214
(citing <u>Duran v. City of Douglas</u>, 904 F.2d 1372, 1378 (9th Cir.
1989)("[n]o less well established is the principle that
government officials . . . may not exercise their authority for

personal motives, particularly in response to real or perceived slights to their dignity.") Not only was it well-established law that Pellegrino was within her rights to report the TSOs to her supervisors for conduct she perceived to be inappropriate without facing retaliatory action, but also that she could not be arrested or prosecuted for using profanity to express her disapproval. Viewing the evidence most favorably to Pellegrino, the individual defendants should have known they were exercising their authority in violation of well-established constitutional rights.[11]

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motion for Summary Judgment.

---

[11] This case differs from George v. Rehiel, 738 F.3d 562 (3d Cir. 2013), in which the Third Circuit held that TSA officials were entitled to qualified immunity because their suspicion about a passenger's carrying Arabic flashcards and a book critical of U.S. foreign policy, as opposed to retaliatory motives for his Constitutional ownership of those items, was an obvious alternative explanation for their increased scrutiny during the airport screening. Id. at 585. In the instant case, however, factual disputes exist as to whether TSA Officials had a non-retaliatory motive for their actions. These disputes, which require credibility determinations, must be decided by a jury.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NADINE PELLEGRINO AND
HARRY WALDMAN,                    :
                                  :
            Plaintiffs,           :    CIVIL ACTION
                                  :
      v.                          :    NO. 09-5505
                                  :
UNITED STATES OF AMERICA          :
TRANSPORTATION SECURITY           :
ADMINISTRATION, et. al.,          :
                                  :
            Defendants.           :

**ORDER**

AND NOW, this        day of April, 2014, and upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 157) and Plaintiffs' Exhibits filed under seal (Doc. No. 173), it is hereby ORDERED as follows:

(1) The Motion is DENIED as to the following claims:

(A) Plaintiff's property damage claim under the Federal Tort Claims Act ("FTCA") against Defendant United States. This claim will proceed to trial.

(B) Plaintiff's <u>Bivens</u> Claims against Defendants Abdul-Malik and Labbee in their individual capacities, based on the prosecution of Nadine Pellegrino for Making Terroristic Threats, for

(i) Malicious Prosecution under the Fourth Amendment;

(ii) Retaliatory Prosecution under the First Amendment;

and

(iii) Conspiracy to Engage in Malicious Prosecution

under the First and Fourth Amendments.

These claims will proceed to trial.

(2) The Motion is GRANTED as to all other claims and those claims

are DISMISSED.


BY THE COURT:


/s/ J. Curtis Joyner

_____

J. CURTIS JOYNER, J.